# UNITED STATES *v.* KOZMINSKI ET AL.

No. 86–2000.   Argued February 23, 1988—Decided June 29, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post.* p. 953. STEVENS, J., filed an opinion concurring in the judgment, in which BLACKMUN, J., joined, *post*, p. 965.

*Assistant Attorney General Reynolds* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Bryson, Deputy Assistant Attorney General Clegg, Richard J. Lazarus,* and *Jessica Dunsay Silver.*

*Carl Ziemba* argued the cause and filed a brief for respondents.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case concerns the scope of two criminal statutes enacted by Congress to enforce the Thirteenth Amendment. Title 18 U. S. C. § 241 prohibits conspiracy to interfere with an individual's Thirteenth Amendment right to be free from "involuntary servitude." Title 18 U. S. C. § 1584 makes it a crime knowingly and willfully to hold another person "to involuntary servitude." We must determine the meaning of "involuntary servitude" under these two statutes.

## I

In 1983, two mentally retarded men were found laboring on a Chelsea, Michigan, dairy farm in poor health, in squalid conditions, and in relative isolation from the rest of society. The operators of the farm—Ike Kozminski, his wife Margarethe, and their son John—were charged with violating 18 U. S. C. § 241 by conspiring to "injure, oppress, threaten, or intimidate" the two men in the free exercise and enjoyment of their federal right to be free from involuntary servitude. The Kozminskis were also charged with knowingly holding, or aiding and abetting in the holding of, the two men to involuntary servitude in violation of 18 U. S. C. § 1584 and § 2.[1] The case was tried before a jury in the United States District Court for the Eastern District of Michigan. The Government's evidence is summarized below.

The victims, Robert Fulmer and Louis Molitoris, have intelligence quotients of 67 and 60 respectively. Though chronologically in their 60's during the period in question,

---

*Alan G. Martin* and *David M. Liberman* filed a brief for the International Society for Krishna Consciousness of California, Inc., as *amicus curiae*.

[1] Title 18 U. S. C. § 2 provides, in pertinent part, that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

they viewed the world and responded to authority as would someone of 8 to 10 years. Margarethe Kozminski picked Fulmer up one evening in 1967 while he was walking down the road, and brought him to work at one of the Kozminski farms. He was working on another farm at the time, but Mrs. Kozminski simply left a note telling his former employer that he had gone. Molitoris was living on the streets of Ann Arbor, Michigan, in the early 1970's when Ike Kozminski brought him to work on the Chelsea farm. He had previously spent several years at a state mental hospital.

Fulmer and Molitoris worked on the Kozminskis' dairy farm seven days a week, often 17 hours a day, at first for $15 per week and eventually for no pay. The Kozminskis subjected the two men to physical and verbal abuse for failing to do their work and instructed herdsmen employed at the farm to do the same. The Kozminskis directed Fulmer and Molitoris not to leave the farm, and on several occasions when the men did leave, the Kozminskis or their employees brought the men back and discouraged them from leaving again. On one occasion, John Kozminski threatened Molitoris with institutionalization if he did not do as he was told.

The Kozminskis failed to provide Fulmer and Molitoris with adequate nutrition, housing, clothing, or medical care. They directed the two men not to talk to others and discouraged the men from contacting their relatives. At the same time, the Kozminskis discouraged relatives, neighbors, farm hands, and visitors from contacting Fulmer and Molitoris. Fulmer and Molitoris asked others for help in leaving the farm, and eventually a herdsman hired by the Kozminskis was concerned about the two men and notified county officials of their condition. County officials assisted Fulmer and Molitoris in leaving the farm and placed them in an adult foster care home.

In attempting to persuade the jury that the Kozminskis held their victims in involuntary servitude, the Government did not rely solely on evidence regarding their use or threat-

ened use of physical force or the threat of institutionalization. Rather, the Government argued that the Kozminskis had used various coercive measures—including denial of pay, subjection to substandard living conditions, and isolation from others—to cause the victims to believe they had no alternative but to work on the farm. The Government argued that Fulmer and Molitoris were "psychological hostages" whom the Kozminskis had "brainwash[ed]" into serving them. Tr. 15, 23.[2]

At the conclusion of the evidence, the District Court instructed the jurors that in order to convict the Kozminskis of conspiracy under § 241, they must find (1) the existence of a conspiracy including the Kozminskis, (2) that the purpose of the conspiracy was to injure, oppress, threaten, or intimidate a United States citizen in the free exercise or enjoyment of a federal right to be free from involuntary servitude, and (3) that one of the conspirators knowingly committed an overt act in furtherance of that purpose. The court further instructed the jury that § 1584 required the Government to prove (1) that the Kozminskis held the victims in involuntary servitude, (2) that they acted knowingly or willfully, and (3) that their actions were a necessary cause of the victims' decision to continue working for them. The court delivered the following instruction on the meaning of involuntary servitude under both statutes:

> "Involuntary servitude consists of two terms.
> "Involuntary means 'done contrary to or without choice'—'compulsory'—'not subject to control of the will.'

---

[2] The Government produced an expert witness who testified that the Kozminskis' general treatment of the two men caused the men to undergo an "involuntary conversion" to complete dependency. App. to Pet. for Cert. 15a. The Court of Appeals held that this expert testimony was admitted in violation of Federal Rule of Evidence 702. The Government has not sought review of this ruling, and we do not address it.

"Servitude means '[a] condition in which a person lacks liberty especially to determine one's course of action or way of life'—'slavery'—'the state of being subject to a master.'

"Involuntary servitude involves a condition of having some of the incidents of slavery.

"It may include situations in which persons are forced to return to employment by law.

"It may also include persons who are physically restrained by guards from leaving employment.

"It may also include situations involving either physical and other coercion, or a combination thereof, used to detain persons in employment.

.          .          .          .          .

"In other words, based on all the evidence it will be for you to determine if there was a means of compulsion used, sufficient in kind and degree, to subject a person having the same general station in life as the alleged victims to believe they had no reasonable means of escape and no choice except to remain in the service of the employer." App. to Pet. for Cert. 109a–110a.

So instructed, the jury found Ike and Margarethe Kozminski guilty of violating both statutes. John Kozminski was convicted only on the § 241 charge. Each of the Kozminskis was placed on probation for two years. In addition, Ike Kozminski was fined $20,000 and was ordered to pay $6,190.80 in restitution to each of the victims. John Kozminski was fined $10,000.

A divided panel of the Court of Appeals for the Sixth Circuit affirmed the convictions. App. to Pet. for Cert. 72a. After rehearing the case en banc, however, the Court of Appeals reversed the convictions and remanded the case for a new trial. 821 F. 2d 1186 (1987). The majority concluded that the District Court's definition of involuntary servitude, which would bring cases involving general psychological coer-

cion within the reach of § 241 and § 1584, was too broad. The court held that involuntary servitude exists only when

> "(a) the servant believes that he or she has no viable alternative but to perform service for the master (b) because of (1) the master's use or threatened use of physical force, or (2) the master's use or threatened use of state-imposed legal coercion (*i. e.*, peonage), or (3) the master's use of fraud or deceit to obtain or maintain services where the servant is a minor, an immigrant or one who is mentally incompetent." 821 F. 2d, at 1192 (footnote omitted).

The dissenting judges charged that the majority had "rewritten rather than interpreted" § 1584. *Id.*, at 1213. They argued that involuntary servitude may arise from whatever means the defendant intentionally uses to subjugate the will of the victim so as to render the victim "'incapable of making a rational choice.'" *Id.*, at 1212–1213 (quoting *United States* v. *Shackney*, 333 F. 2d 475, 488 (CA2 1964) (Dimock, J., concurring)).

The Court of Appeals' definition of involuntary servitude conflicts with the definitions adopted by other Courts of Appeals. Writing for the Second Circuit in *United States* v. *Shackney, supra,* Judge Friendly reasoned that

> "a holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement, . . . not a situation where the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad." *Id.*, at 486.

Accordingly, Judge Friendly concluded that § 1584 prohibits only "service compelled by law, by force or by the threat of continued confinement of some sort." *Id.*, at 487. See also *United States* v. *Harris*, 701 F. 2d 1095, 1100 (CA4 1983) (in-

voluntary servitude exists under § 241 and § 1584 where labor is coerced by "threat of violence or confinement, backed sufficiently by deeds"); *United States* v. *Bibbs*, 564 F. 2d 1165, 1168 (CA5 1977) (involuntary servitude exists under § 1584 where the defendant places the victim "in such fear of physical harm that the victim is afraid to leave"). The Ninth Circuit, in contrast, has not limited the reach of § 1584 to cases involving physical force or legal sanction, but has concluded that

> "[a] holding in involuntary servitude occurs when an individual coerces another into his service by improper or wrongful conduct that is intended to cause, and does cause, the other person to believe that he or she has no alternative but to perform labor." *United States* v. *Mussry*, 726 F. 2d 1448, 1453 (1984).

See also *United States* v. *Warren*, 772 F. 2d 827, 833–834 (CA11 1985) ("Various forms of coercion may constitute a holding in involuntary servitude. The use, or threatened use, of physical force to create a climate of fear is the most grotesque example of such coercion").

We granted the Government's petition for a writ of certiorari, 484 U. S. 894 (1987), to resolve this conflict among the Courts of Appeals on the meaning of involuntary servitude for the purpose of criminal prosecution under § 241 and § 1584.

## II

Federal crimes are defined by Congress, and so long as Congress acts within its constitutional power in enacting a criminal statute, this Court must give effect to Congress' expressed intention concerning the scope of conduct prohibited. See *Dowling* v. *United States*, 473 U. S. 207, 213, 214 (1985) (citing *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820)). Congress' power to enforce the Thirteenth Amendment by enacting § 241 and § 1584 is clear and undisputed. See U. S. Const., Amdt. 13, § 2 ("Congress shall have power to enforce

this article by appropriate legislation"); *Griffin* v. *Breckenridge,* 403 U. S. 88, 105 (1971). The scope of conduct prohibited by these statutes is therefore a matter of statutory construction.

The Court of Appeals reached its conclusions regarding the meaning of involuntary servitude under both § 241 and § 1584 based solely on its analysis of the language and history of § 1584. A reading of these statutes, however, reveals an obvious difference between them. Unlike § 1584, which by its terms prohibits holding to involuntary servitude, § 241 prohibits conspiracies to interfere with rights secured "by the Constitution or laws of the United States," and thus incorporates the prohibition of involuntary servitude contained in the Thirteenth Amendment. See *United States* v. *Price,* 383 U. S. 787, 805 (1966). The indictment in this case, which was read to the jury, specifically charged the Kozminskis with conspiring to interfere with the "right and privilege secured . . . by the Constitution and laws of the United States *to be free from involuntary servitude as provided by the Thirteenth Amendment of the United States Constitution.*" App. 177 (emphasis added). Thus, the indictment clearly specified a conspiracy to violate the Thirteenth Amendment. The indictment cannot be read to charge a conspiracy to violate § 1584 rather than the Thirteenth Amendment, because the criminal sanction imposed by § 1584 does not create any individual "right or privilege" as those words are used in § 241. The Government has not conceded that the definition of involuntary servitude as used in the Thirteenth Amendment is limited by the meaning of the same phrase in § 1584. To the contrary, the Government argues (1) that the Thirteenth Amendment should be broadly construed, and (2) that Congress did not intend § 1584 to have a narrower scope. Brief for United States 22–32. The District Court defined involuntary servitude broadly under both § 241 and § 1584. The Court of Appeals reversed the convictions under both counts because it concluded that the defini-

tion of involuntary servitude given for each count was erroneous. Since the proper interpretation of each statute is squarely before us, we construe each statute separately to ascertain the conduct it prohibits.

A

Section 241 authorizes punishment when

"two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same."

This Court interpreted the purpose and effect of § 241 over 20 years ago in *United States* v. *Guest*, 383 U. S. 745 (1966), and *United States* v. *Price, supra.* Section 241 creates no substantive rights, but prohibits interference with rights established by the Federal Constitution or laws and by decisions interpreting them. *Guest, supra,* at 754–755; *Price, supra,* at 803. Congress intended the statute to incorporate by reference a large body of potentially evolving federal law. This Court recognized, however, that a statute prescribing criminal punishment must be interpreted in a manner that provides a definite standard of guilt. The Court resolved the tension between these two propositions by construing § 241 to prohibit only intentional interference with rights made specific either by the express terms of the Federal Constitution or laws or by decisions interpreting them. *Price, supra,* at 806, n. 20; *Guest, supra,* at 754–755. Cf. *Screws* v. *United States*, 325 U. S. 91, 102 (1945).

The Kozminskis were convicted under § 241 for conspiracy to interfere with the Thirteenth Amendment guarantee against involuntary servitude. Applying the analysis set out in *Price* and *Guest*, our task is to ascertain the precise definition of that crime by looking to the scope of the Thirteenth Amendment prohibition of involuntary servitude specified in our prior decisions.

The Thirteenth Amendment declares that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." The Amendment is "self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances," *Civil Rights Cases,* 109 U. S. 3, 20 (1883), and thus establishes a constitutional guarantee that is protected by § 241. See *Price, supra,* at 805. The primary purpose of the Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase "involuntary servitude" was intended to extend "to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Butler* v. *Perry,* 240 U. S. 328, 332 (1916). See also *Robertson* v. *Baldwin,* 165 U. S. 275, 282 (1897); *Slaughter-House Cases,* 16 Wall. 36, 69 (1873).

While the general spirit of the phrase "involuntary servitude" is easily comprehended, the exact range of conditions it prohibits is harder to define. The express exception of involuntary servitude imposed as a punishment for crime provides some guidance. The fact that the drafters felt it necessary to exclude this situation indicates that they thought involuntary servitude includes at least situations in which the victim is compelled to work by law. Moreover, from the general intent to prohibit conditions "akin to African slavery," see *Butler* v. *Perry, supra,* at 332–333, as well as the fact that the Thirteenth Amendment extends beyond state action, compare U. S. Const., Amdt. 14, § 1, we readily can deduce an intent to prohibit compulsion through physical coercion.

This judgment is confirmed when we turn to our previous decisions construing the Thirteenth Amendment. Looking behind the broad statements of purpose to the actual hold-

ings, we find that in every case in which this Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction. In *Clyatt* v. *United States*, 197 U. S. 207 (1905), for example, the Court recognized that peonage—a condition in which the victim is coerced by threat of legal sanction to work off a debt to a master—is involuntary servitude under the Thirteenth Amendment. *Id.*, at 215, 218. Similarly, in *United States* v. *Reynolds*, 235 U. S. 133 (1914), the Court held that "[c]ompulsion of . . . service by the constant fear of imprisonment under the criminal laws" violated "rights intended to be secured by the Thirteenth Amendment." *Id.*, at 146, 150. In that case the Court struck down a criminal surety system under which a person fined for a misdemeanor offense could contract to work for a surety who would, in turn, pay the convict's fine to the State. The critical feature of the system was that that breach of the labor contract by the convict was a crime. The convict was thus forced to work by threat of criminal sanction. The Court has also invalidated state laws subjecting debtors to prosecution and criminal punishment for failing to perform labor after receiving an advance payment. *Pollock* v. *Williams*, 322 U. S. 4 (1944); *Taylor* v. *Georgia*, 315 U. S. 25 (1942); *Bailey* v. *Alabama*, 219 U. S. 219 (1911). The laws at issue in these cases made failure to perform services for which money had been obtained prima facie evidence of intent to defraud. The Court reasoned that "the State could not avail itself of the sanction of the criminal law to supply the compulsion [to enforce labor] any more than it could use or authorize the use of physical force." *Bailey, supra*, at 244.

Our precedents reveal that not all situations in which labor is compelled by physical coercion or force of law violate the Thirteenth Amendment. By its terms the Amendment excludes involuntary servitude imposed as legal punishment for a crime. Similarly, the Court has recognized that the prohibition against involuntary servitude does not prevent the

State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties. See *Hurtado* v. *United States*, 410 U. S. 578, 589, n. 11 (1973) (jury service); *Selective Draft Law Cases*, 245 U. S. 366, 390 (1918) (military service); *Butler* v. *Perry*, *supra* (roadwork). Moreover, in *Robertson* v. *Baldwin*, 165 U. S. 275 (1897), the Court observed that the Thirteenth Amendment was not intended to apply to "exceptional" cases well established in the common law at the time of the Thirteenth Amendment, such as "the right of parents and guardians to the custody of their minor children or wards," *id.*, at 282, or laws preventing sailors who contracted to work on vessels from deserting their ships. *Id.*, at 288.

Putting aside such exceptional circumstances, none of which are present in this case, our precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion. The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion. We draw no conclusions from this historical survey about the potential scope of the Thirteenth Amendment. Viewing the Amendment, however, through the narrow window that is appropriate in applying § 241, it is clear that the Government cannot prove a conspiracy to violate rights secured by the Thirteenth Amendment without proving that the conspiracy involved the use or threatened use of physical or legal coercion.

B

Section 1584 authorizes criminal punishment of

"[w]hoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude any other person for any term."

This is our first occasion to consider the reach of this statute. The pivotal phrase, "involuntary servitude," clearly was bor-

rowed from the Thirteenth Amendment. Congress' use of the constitutional language in a statute enacted pursuant to its constitutional authority to enforce the Thirteenth Amendment guarantee makes the conclusion that Congress intended the phrase to have the same meaning in both places logical, if not inevitable. In the absence of any contrary indications, we therefore give effect to congressional intent by construing "involuntary servitude" in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment. See *United States* v. *Shackney,* 333 F. 2d 475 (CA2 1964) (Friendly, J.).

Section 1584 was enacted as part of the 1948 revision to the Criminal Code. At that time, all of the Court's decisions identifying conditions of involuntary servitude had involved compulsion of services through the use or threatened use of physical or legal coercion. See, *e. g., Clyatt* v. *United States, supra; United States* v. *Reynolds, supra; Pollock* v. *Williams, supra; Bailey* v. *Alabama, supra.* By employing the constitutional language, Congress apparently was focusing on the prohibition of comparable conditions.

The legislative history of § 1584 confirms this conclusion and undercuts the Government's claim that Congress had a broader concept of involuntary servitude in mind. No significant legislative history accompanies the 1948 enactment of § 1584; the statute was adopted as part of a general revision of the Criminal Code. The 1948 version of § 1584 was a consolidation, however, of two earlier statutes: the Slave Trade statute, as amended in 1909, formerly 18 U. S. C. § 423 (1940 ed.), and the 1874 Padrone statute, formerly 18 U. S. C. § 446 (1940 ed.). There are some indications that § 1584 was intended to have the same substantive reach as these statutes. See, *e. g.,* A. Holtzoff, Preface to Title 18 U. S. C. A. (1969) ("In general, with a few exceptions, the Code does not attempt to change existing law"); Revision of Titles 18 and 28 of the United States Code: Hearings on H. R. 1600 and H. R. 2055 before Subcommittee No. 1 of the

House Committee on the Judiciary, 80th Cong., 1st Sess., 13–14 (1947) (statement of advisory committee member Justin Miller). But see *United States* v. *Shackney, supra,* at 482 (viewing changes made in the course of consolidation as significant and § 1584 as positive law). Whether or not § 1584 was intended to track these earlier statutes exactly, it was most assuredly not intended to work a radical change in the law. We therefore review the legislative history of the Slave Trade statute and the Padrone statute to inform our construction of § 1584.

The original Slave Trade statute authorized punishment of persons who "hold, sell, or otherwise dispose of any . . . negro, mulatto, or person of colour, so brought [into the United States] as a slave, or to be held to service or labour." Act of Apr. 20, 1818, ch. 91, § 6, 3 Stat. 452. This statute was one of several measures passed in the early 19th century for the purpose of ending the African slave trade. A 1909 amendment removed the racial restriction, extending the statute to the holding of "any person" as a slave. This revision, however, left unchanged that portion of the statute describing the condition under which such persons were held. See 42 Cong. Rec. 1114 (1908). The Government attempts to draw a contrary conclusion from a comment by Senator Heyburn to the effect that the 1909 amendment was intended to protect vulnerable people who were brought into the United States for labor or for immoral purposes. *Id.,* at 1115. This comment is inconclusive, however. Other Senators expressly disagreed with the view that the elimination of the racial restriction changed the meaning of the word "slavery." See *id.,* at 1114–1115. Moreover, the 1909 reenactment of the Slave Trade statute was part of a general codification of the federal penal laws, which Senator Heyburn himself stated was "in no instance to change the practice of the law." *Id.,* at 2226. Thus, we conclude that nothing in the history of the Slave Trade statute suggests that it was intended to extend

to conditions of servitude beyond those applied to slaves, *i. e.*, physical or legal coercion.

The other precursor of § 1584, the Padrone statute, reflects a similarly limited scope. The "padrones" were men who took young boys away from their families in Italy, brought them to large cities in the United States, and put them to work as street musicians or beggars. Congress enacted the Padrone statute in 1874 "to prevent [this] practice of enslaving, buying, selling, or using Italian children." 2 Cong. Rec. 4443 (1874) (Rep. Cessna). The statute provided that

> "whoever shall knowingly and wilfully bring into the United States . . . any person inveigled or forcibly kidnapped in any other country, with intent to hold such person . . . in confinement or to any involuntary service, and whoever shall knowingly and wilfully sell, or cause to be sold, into any condition of involuntary servitude, any other person for any term whatever, and every person who shall knowingly and wilfully hold to involuntary service any person so sold and bought, shall be deemed guilty of a felony." Act of June 23, 1874, ch. 464. 18 Stat. 251.

This statute, too, was aimed only at compulsion of service through physical or legal coercion. To be sure, use of the term "inveigled" indicated that the statute was intended to protect persons brought into this country by other means. But the statute drew a careful distinction between the manner in which persons were brought into the United States and the conditions in which they were subsequently held, which are expressly identified as "confinement" or "involuntary servitude." Our conclusion that Congress believed these terms to be limited to situations involving physical or legal coercion is confirmed when we examine the actual physical conditions facing the victims of the padrone system. These young children were literally stranded in large, hostile cities in a foreign country. They were given no education or other assistance toward self-sufficiency. Without such as-

sistance, without family, and without other sources of support, these children had no actual means of escaping the padrones' service; they had no choice but to work for their masters or risk physical harm. The padrones took advantage of the special vulnerabilities of their victims, placing them in situations where they were physically unable to leave.

The history of the Padrone statute reflects Congress' view that a victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude. For example, a child who is told he can go home late at night in the dark through a strange area may be subject to physical coercion that results in his staying, although a competent adult plainly would not be. Similarly, it is possible that threatening an incompetent with institutionalization or an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude. But the Padrone statute does not support the Court of Appeals' conclusion that involuntary servitude can exist absent the use or threatened use of physical or legal coercion to compel labor. Moreover, far from broadening the definition of involuntary servitude for immigrants, children, or mental incompetents, § 1584 eliminated any special distinction among, or protection of, special classes of victims.

Thus, the language and legislative history of § 1584 both indicate that its reach should be limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion. Congress chose to use the language of the Thirteenth Amendment in § 1584 and this was the scope of that constitutional provision at the time § 1584 was enacted.

## C

The Government has argued that we should adopt a broad construction of "involuntary servitude," which would prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice. Under this interpretation, involuntary servitude would include compulsion through psychological coercion as well as almost any other type of speech or conduct intentionally employed to persuade a reluctant person to work.

This interpretation would appear to criminalize a broad range of day-to-day activity. For example, the Government conceded at oral argument that, under its interpretation, § 241 and § 1584 could be used to punish a parent who coerced an adult son or daughter into working in the family business by threatening withdrawal of affection. Tr. of Oral Arg. 12. It has also been suggested that the Government's construction would cover a political leader who uses charisma to induce others to work without pay or a religious leader who obtains personal services by means of religious indoctrination. See Brief in Opposition 4; Brief for the International Society for Krishna Consciousness of California, Inc., as *Amicus Curiae* 25. As these hypotheticals suggest, the Government's interpretation would delegate to prosecutors and juries the inherently legislative task of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes. It would also subject individuals to the risk of arbitrary or discriminatory prosecution and conviction.

Moreover, as the Government would interpret the statutes, the type of coercion prohibited would depend entirely upon the victim's state of mind. Under such a view, the statutes would provide almost no objective indication of the conduct or condition they prohibit, and thus would fail to provide fair notice to ordinary people who are required to con-

form their conduct to the law. The Government argues that any such difficulties are eliminated by a requirement that the defendant harbor a specific intent to hold the victim in involuntary servitude. But in light of the Government's failure to give any objective content to its construction of the phrase "involuntary servitude," this specific intent requirement amounts to little more than an assurance that the defendant sought to do "an unknowable something." *Screws* v. *United States*, 325 U. S., at 105.

In short, we agree with Judge Friendly's observation that

> "[t]he most ardent believer in civil rights legislation might not think that cause would be advanced by permitting the awful machinery of the criminal law to be brought into play whenever an employee asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful." *United States* v. *Schackney*, 333 F. 2d., at 487.

Accordingly, we conclude that Congress did not intend § 1584 to encompass the broad and undefined concept of involuntary servitude urged upon us by the Government.

JUSTICE BRENNAN would hold that § 1584 prohibits not only the use or threatened use of physical or legal coercion, but also any means of coercion "that actually succeeds in reducing the victim to a condition of servitude resembling that in which slaves were held before the Civil War." *Post*, at 962. This formulation would be useful if it were accompanied by a recognition that the use or threat of physical or legal coercion was a necessary incident of pre-Civil War slavery and thus of the "'slavelike' conditions of servitude Congress most clearly intended to eradicate." *Post*, at 961. Instead, finding no objective factor to be necessary to a "slavelike condition," JUSTICE BRENNAN would delegate to prosecutors and juries the task of determining what working conditions are so oppressive as to amount to involuntary servitude.

Such a definition of involuntary servitude is theoretically narrower than that advocated by the Government, but it suffers from the same flaws. The ambiguity in the phrase "slavelike conditions" is not merely a question of degree, but instead concerns the very nature of the conditions prohibited. Although we can be sure that Congress intended to prohibit "'slavelike' conditions of servitude," we have no indication that Congress thought that conditions maintained by means other than by the use or threatened use of physical or legal coercion were "slavelike." Whether other conditions are so intolerable that they, too, should be deemed to be involuntary is a value judgment that we think is best left for Congress.

JUSTICE STEVENS concludes that Congress intended to delegate to the Judiciary the inherently legislative task of defining "involuntary servitude" through case-by-case adjudication. *Post*, at 965. Neither the language nor the legislative history of § 1584 provides an adequate basis for such a conclusion. Reference to the Sherman Act does not advance JUSTICE STEVENS' argument, for that Act does not authorize courts to develop standards for the imposition of criminal punishment. To the contrary, this Court determined that the objective standard to be used in deciding whether conduct violates the Sherman Act—the rule of reason—was evinced by the language and the legislative history of the Act. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 60 (1911). It is one thing to recognize that some degree of uncertainty exists whenever judges and juries are called upon to apply substantive standards established by Congress; it would be quite another thing to tolerate the arbitrariness and unfairness of a legal system in which the judges would develop the standards for imposing criminal punishment on a case-by-case basis.

Sound principles of statutory construction lead us to reject the amorphous definitions of involuntary servitude proposed by the Government and by JUSTICES BRENNAN and STE-

VENS. By construing § 241 and § 1584 to prohibit only compulsion of services through physical or legal coercion, we adhere to the time-honored interpretive guideline that uncertainty concerning the ambit of criminal statutes should be resolved in favor of lenity. See, *e. g., McNally* v. *United States*, 483 U. S. 350 (1987); *Dowling* v. *United States*, 473 U. S. 207, 229 (1985); *Liparota* v. *United States*, 471 U. S. 419, 427 (1985); *Rewis* v. *United States*, 401 U. S. 808, 812 (1971). The purposes underlying the rule of lenity—to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts—are certainly served by its application in this case.

### III

Absent change by Congress, we hold that, for purposes of criminal prosecution under § 241 or § 1584, the term "involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. This definition encompasses those cases in which the defendant holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion. Our holding does not imply that evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities is irrelevant in a prosecution under these statutes. As we have indicated, the vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve. In addition, a trial court could properly find that evidence of other means of coercion or of extremely poor working conditions is relevant to corroborate disputed evidence regarding the use or threatened use of physical or legal coercion, the defendant's intention in using such means, or the causal effect of such conduct. We hold only that the jury

must be instructed that compulsion of services by the use or threatened use of physical or legal coercion is a necessary incident of a condition of involuntary servitude.

The District Court's instruction on involuntary servitude, which encompassed other means of coercion, may have caused the Kozminskis to be convicted for conduct that does not violate either statute. Accordingly, we agree with the Court of Appeals that the convictions must be reversed and the case remanded for a new trial.

We disagree with the Court of Appeals to the extent it determined that a defendant could violate § 241 or § 1584 by means other than the use or threatened use of physical or legal coercion where the victim is a minor, an immigrant, or one who is mentally incompetent. But because we believe the record contains sufficient evidence of physical or legal coercion to enable a jury to convict the Kozminskis even under the stricter standard of involuntary servitude that we announce today, we agree with the Court of Appeals that a judgment of acquittal is unwarranted.

The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

I agree with the Court that the construction given 18 U. S. C. § 1584 by the District Court and the Government either sweeps beyond the intent of Congress or fails to define the criminal conduct with sufficient specificity, and that a new trial under different instructions is therefore required. I cannot, however, square the Court's decision to add a physical or legal coercion limitation to the statute with either the statutory text or legislative history, and would adopt a different statutory construction that, I think, defines the crime with sufficient specificity but comports better with the evident intent of Congress.

## I

It is common ground among the parties and all the courts and Justices that have interpreted § 1584[1] that it encompasses, at a minimum, the compulsion of labor via the use or threat of physical or legal coercion. That much need not be belabored, for the use of the master's whip and the power of the State to compel one human to labor for another were clearly core elements of slavery that the Thirteenth Amendment and its statutory progeny intended to eliminate. As the Government points out, however, the language of both the Thirteenth Amendment and § 1584 simply prohibits "involuntary servitude" and contains no words limiting the prohibition to servitude compelled by particular methods. "[The Thirteenth] amendment denounces a status or condition, irrespective of the manner or authority by which it is created." *Clyatt* v. *United States*, 197 U. S. 207, 216 (1905).

---

[1] The District Court instructed the jury to incorporate the definition of "involuntary servitude" from § 1584 into 18 U. S. C. § 241. The parties did not challenge this incorporation either below or in this Court, but rather argued only that the § 1584 definition the District Court incorporated was incorrect. 821 F. 2d 1186, 1188, n. 3 (CA6 1987). I therefore believe it appropriate to address only the proper construction of § 1584. I note also that the § 241 count of the indictment charged a conspiracy to interfere with the "free exercise and enjoyment of the right and privilege secured to [the victims] by the Constitution *and laws* of the United States to be free from involuntary servitude as provided by the Thirteenth Amendment of the United States Constitution." App. 177 (emphasis added). Thus, the parties may have assumed that § 1584 is a "la[w] of the United States" specifying the content of the constitutional right to be free from involuntary servitude, cf. *ante,* at 941, and that accordingly if respondents' actions violated § 1584, the conspiracy to engage in those actions would necessarily constitute a violation of § 241. Such an assumption does not strike me as at all unreasonable. At any rate, for whatever reason the parties never raised the argument that the definition of "involuntary servitude" under § 241 should differ from that under § 1584, and I think it imprudent to decide that issue in the first instance in this Court and without briefing.

If as a factual matter the use or threat of physical or legal coercion were the only methods by which a condition of involuntary servitude could be created, then the constitutional and statutory text might provide some support for the Court's conclusion. But the Court does not dispute that other methods can coerce involuntary labor—indeed it is precisely the broad range of nonphysical private activities capable of coercing labor that the Court cites as the basis for its vagueness concerns. See *ante*, at 949; see also n. 5, *infra*. I address those concerns below, but the point here is only that those concerns, however serious, are not textual concerns, for the text suggests no grounds for distinguishing among different means of coercing involuntary servitude. Nor do I know of any empirical grounds for assuming that involuntary servitude can be coerced only by physical or legal means.[2] To the contrary, it would seem that certain psychological, economic, and social means of coercion can be just as effective as physical or legal means, particularly where the victims are especially vulnerable, such as the mentally disabled victims in this case. Surely threats to burn down a person's home or business or to rape or kill a person's spouse or children can have greater coercive impact than the mere threat of a beating, yet the coercive impact of such threats turns not on any direct physical effect that would be felt by the laborer but on the psychological, emotional, social, or economic injury the

---

[2] In other contexts, we have recognized that nonphysical coercion can induce involuntary action. For example, we have interpreted the federal crime of kidnaping to include the imposition of "an unlawful physical *or mental* restraint" to confine the victim against his will. *Chatwin* v. *United States*, 326 U. S. 455, 460 (1946) (emphasis added). Similarly, in determining when confessions are involuntary, we have noted "coercion can be mental as well physical . . . . [T]he efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'" *Blackburn* v. *Alabama*, 361 U. S. 199, 206 (1960). "When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal." *Watts* v. *Indiana*, 338 U. S. 49, 53 (1949) (plurality opinion of Frankfurter, J.).

laborer would suffer as a result of harm to his or her home, business, or loved ones. And drug addiction or the weakness resulting from a lack of food, sleep, or medical care can eliminate the will to resist as readily as the fear of a physical blow. Hypnosis, blackmail, fraud, deceit, and isolation are also illustrative methods—but it is unnecessary here to canvas the entire spectrum of nonphysical machinations by which humans coerce each other. It suffices to observe that one can imagine many situations in which nonphysical means of private coercion can subjugate the will of a servant.

Indeed, this case and others readily reveal that the typical techniques now used to hold persons in slavelike conditions are not limited to physical or legal means. The techniques in this case, for example, included disorienting the victims with frequent verbal abuse and complete authoritarian domination; inducing poor health by denying medical care and subjecting the victims to substandard food, clothing, and living conditions; working the victims from 3 a.m. to 8:30 p.m. with no days off, leaving them tired and without free time to seek alternative work; denying the victims any payment for their labor; and active efforts to isolate the victims from contact with outsiders who might help them.[3] Without considering these techniques (and their particular effect on a mentally disabled person), one would hardly have a complete picture of whether the coercion inflicted on the victims was sufficient to

---

[3] Although not detailed by the Court, the Government introduced evidence that the Kozminskis (1) ripped a phone off the wall in the barn when one of the victims was caught using it, and did not simply "discourage" contact with relatives but falsely told relatives who asked to speak to the victims that the victims did not want to see them and falsely told the victims that their relatives were not interested in them; (2) falsely told neighbors that the victims were in their custody as wards of the State; and (3) refused to allow the victims to seek medical care, even when one was gored by a bull and the tip of the other's thumb was cut off (both victims eventually became very ill while serving the Kozminskis). The Court also neglects to mention that the Government has conceded that the victims were not forcibly held to work on the farm. 821 F. 2d, at 1188.

make their servitude involuntary. Other involuntary servitude cases have also chronicled a variety of nonphysical and nonlegal means of coercion including trickery; isolation from friends, family, transportation or other sources of food, shelter, clothing, or jobs; denying pay or creating debt that is greater than the worker's income by charging exorbitant rates for food, shelter, or clothing; disorienting the victims by placing them in an unfamiliar environment, barraging them with orders, and controlling every detail of their lives; and weakening the victims with drugs, alcohol, or by lack of food, sleep, or proper medical care. See, *e. g.*, *United States* v. *Warren*, 772 F. 2d 827 (CA11 1985); *United States* v. *Mussry*, 726 F. 2d 1448 (CA9 1984); *United States* v. *Ingalls*, 73 F. Supp. 76 (SD Cal. 1947). One presumes these methods of coercion would not reappear with such depressing regularity if they were ineffective.[4]

My reading of the statutory language as not limited to physical or legal coercion is strongly bolstered by the legislative history. Section 1584 was created out of the consolidation of the Slave Trade statute and the Padrone statute. *Ante*, at 945. I agree with the Government that the background of both those statutes suggests that Congress intended to protect persons subjected to involuntary servitude by forms of coercion more subtle than force. The Padrone statute, for example, was designed to outlaw what was known as the "padrone system" whereby padrones in Italy inveigled from their parents young boys whom the padrones then used without pay as beggars, bootblacks, or street musicians. Once in this country, without relatives to turn to, the children had little choice but to submit to the demands of those asserting authority over them, yet this form of coercion was deemed sufficient—without any evidence of physical or legal coercion—to hold the boys in "involuntary servitude." See

---

[4] Because the Court today adopts an expansive but rather obscure understanding of what "physical" coercion encompasses, see nn. 5, 12, *infra*, it is difficult to tell which, if any, of the means of coercion described in the last two paragraphs the Court would deem "physical."

*United States* v. *Ancarola*, 1 F. 676, 682–684 (CC SDNY 1880). Given the nature of the system the Padrone statute aimed to eliminate, the statute's use of the words "involuntary servitude" demonstrates not that the statute was "aimed only at compulsion of service through physical or legal coercion," *ante*, at 947, but that Congress understood "involuntary servitude" to cover servitude compelled through other means of coercion.[5] Indeed, the official title of the Padrone statute was "An act to protect persons of foreign birth against forcible constraint *or* involuntary servitude," Act of June 23, 1874, ch. 464, 18 Stat. 251 (emphasis added); 2 Cong. Rec. 4443 (1874), and the legislative history describes the statute as broadly "intended to prevent the practice of enslaving, buying, selling, *or using* Italian children," *ibid.* (Rep. Cessna) (emphasis added).[6]

---

[5] The Court attempts to evade the inconsistency between its interpretation of § 1584 and the coercion covered by the Padrone statute by asserting that the child victims of the padrone system were in a "situatio[n] involving physical . . . coercion." *Ante*, at 947. Yet the coercion involved, even as the Court describes it, was obviously psychological, social, and economic in nature: "These young children were literally stranded in large, hostile cities in a foreign country. They were given no education or other assistance toward self-sufficiency." *Ibid.* Although it is heartening that the Court recognizes that strange environs and the lack of money, maturity, education, or family support can establish the coercion necessary for involuntary servitude, labeling such coercion "physical" is at best strained and (other than making the legislative history fit the Court's statutory interpretation) accomplishes little but the elimination of whatever certainty the "physical or legal coercion" test would otherwise provide. See n. 12, *infra*.

[6] The legislative history of the Slave Trade statute is less conclusive, but in explaining the necessity of reenacting this ban on importing slaves despite the abolition of slavery and without the statute's original limitation to blacks, Senator Heyburn did make clear that the new statute was intended to protect those who come here "without being a party to the disposition of their services or the control of their rights, whether they be children of irresponsible years and conditions or whether they be people who, because of their environment or the condition of their lives, cannot protect themselves." 42 Cong. Rec. 1115 (1908).

In light of this legislative history, the Court of Appeals below concluded that § 1584 must at least be construed to criminalize nonphysical means of private coercion used to obtain the services of particularly vulnerable victims such as minors, immigrants, or the mentally disabled.  821 F. 2d 1186, 1190–1192 (CA6 1987).  I agree with the Court, however, that this creation of specially protected classes of victims is both textually unsupported and inconsistent with Congress' decision to eliminate such distinctions in enacting § 1584, *ante*, at 950, and thus turn to the task of defining what I regard as the proper construction of the statute.

## II

Based on an analysis of the statutory language and legislative history similar to that set forth in Part I, the Government concludes that § 1584 criminalizes any conduct that intentionally coerces involuntary service.  It is of course not easy to articulate when a person's actions are "involuntary." In some minimalist sense the laborer always has a choice no matter what the threat: the laborer can choose to work, or take a beating; work, or go to jail.  We can all agree that these choices are so illegitimate that any decision to work is "involuntary."  But other coercive choices, even if physical or legal in nature, might present closer questions.  Happily, our task is not to resolve the philosophical meaning of free will, but to determine what coercion Congress would have regarded as sufficient to deem any resulting labor "involuntary" within the meaning of § 1584.

The Government concludes that the statute encompasses any coercion that either leaves the victim with "no tolerable alternative" but to serve the defendant or deprives the victim of "the capacity for rational calculation."  Brief for United States 19, 33.  As the Court notes, however, such a statutory construction potentially sweeps in a broad range of conduct that Congress could not have intended to criminalize. *Ante*, at 949.  The Government attempts to avoid many of

these problems by stressing that a victim does not lack "tolerable alternatives" when he simply has "no attractive or painless options"; the alternatives must be as bad for the victim as physical injury. Brief for United States 33. One can, however, imagine troublesome applications of that test, such as the employer who coerces an employee to remain at her job by threatening her with bad recommendations if she leaves, the religious leader who admonishes his adherents that unless they work for the church they will rot in hell, or the husband who relegates his wife to years of housework by threatening to seek custody of the children if she leaves. Surely being unable to work in one's chosen field, suffering eternal damnation, or losing one's children can be far worse than taking a beating, but are all these instances of involuntary servitude? The difficulty with the Government's test is that although nonphysical forms of private coercion can indeed be as traumatic as physical force, their coercive impact is more highly individualized than that of physical and legal threats. I thus agree with the Court that criminal punishment cannot turn on a case-by-case assessment of whether the alternatives confronting an individual are sufficiently intolerable to render any continued service "involuntary." Such an approach either renders the test hopelessly subjective (if it relies on the victim's assessment of what is tolerable) or delegates open-ended authority to prosecutors and juries (if it relies on what a reasonable person would consider intolerable).[7] Similarly, I agree with the Court that the difficulty of distinguishing the victim deprived of "the capacity for rational calculation" from the victim influenced by love,

---

[7] These problems are not solved by limiting the Government's test to "*improper or wrongful* conduct that is intended to cause, and does cause, the other person to believe that he or she has no alternative but to perform the labor," *United States* v. *Mussry*, 726 F. 2d 1448, 1453 (CA9 1984) (emphasis added), for the criminal has no way of knowing what conduct the prosecutor or jury will deem sufficiently improper or wrongful to criminalize.

charisma, persuasive argument, or religious fervor is sufficiently great that the standard fails to define the criminal conduct with sufficient specificity.

The solution, however, lies not in ignoring those forms of coercion that are perhaps less universal in their effect than physical or legal coercion, but in focusing on the "slavelike" conditions of servitude Congress most clearly intended to eradicate. That the statute prohibits "involuntary servitude" rather than "involuntary service" provides no small insight into the central evil the statute unambiguously aimed to eliminate.[*] For "servitude" generally denotes a relation of complete domination and lack of personal liberty resembling the conditions in which slaves were held prior to the Civil War. Thus, in 1910 and 1949, Webster's defined "servitude" as the "[c]ondition of a slave; slavery; serfdom; bondage; state of compulsory subjection to a master. . . . In French and English Colonies of the 17th and 18th centuries, the condition of transported or colonial laborers who, under contract or by custom, rendered service with temporary and limited loss of political and personal liberty." Webster's New International Dictionary of the English Language. And in 1913 and 1944 Funk and Wagnalls defined "servitude" as "[t]he condition of a slave; a state of subjection to a master or to arbitrary power of any kind" and cited the same colonial practice. Funk and Wagnalls, New Standard Dictionary of the

---

[*] Because, as a criminal statute, § 1584 must be interpreted to conform with special doctrines concerning notice, vagueness, and the rule of lenity, the issue here focuses on what *central* evil the words "involuntary servitude" unambiguously encompass in a way that can be defined with specificity. The interpretation of "involuntary servitude" here is thus necessarily narrower than it would be if the issue were what enforceable civil rights the Thirteenth Amendment provides of its own force or if the issue here concerned the scope of Congress' Thirteenth Amendment authority to pass laws for abolishing all badges or incidents of slavery or servitude. See *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 437–444 (1968).

English Language.[9]   Our cases have expressed the same understanding.   "The word servitude is of larger meaning than slavery, as the latter is popularly understood in this country, and the obvious purpose was to forbid all shades and conditions of African slavery." *Slaughter-House Cases*, 16 Wall. 36, 69 (1873).   "[T]he term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Butler* v. *Perry*, 240 U. S. 328, 332 (1916).   See also *Bailey* v. *Alabama*, 219 U. S. 219, 241 (1911); *Hodges* v. *United States*, 203 U. S. 1, 17 (1906).

I thus conclude that whatever irresolvable ambiguity there may be in determining (for forms of coercion less universal than physical or legal coercion) the degree of coercion Congress would have regarded as sufficient to render any resulting labor "involuntary" within the meaning of § 1584, Congress clearly intended to encompass coercion of any form that actually succeeds in reducing the victim to a condition of servitude resembling that in which slaves were held before the Civil War.[10]   While no one factor is dispositive, complete

---

[9] See also 9 Oxford English Dictionary 522 (1933) ("The condition of being a slave or serf, or of being the property of another person; absence of personal freedom.   Often, and now usually, with the added notion of subjection to the necessity of excessive labor"); Webster's American Dictionary of the English Language 1207 (1869) ("the state of voluntary or involuntary subjection to a master; service; the condition of a slave; slavery; bondage; hence, a state of slavish dependence").

[10] The case involving the crime of holding to slavery that is most contemporaneous with the 1948 passage of § 1584 defined a slave mainly in terms of total domination of person and services and lack of freedom.   *United States* v. *Ingalls*, 73 F. Supp. 76, 78–79 (SD Cal. 1947).

Significantly, the Padrone statute, which encompassed coercion through other than physical or legal means, see *supra*, at 957–958, was designed to prevent boys from being "held in a condition of practical slavery," 42 Cong. Rec. 1122 (1908) (Sen. Lodge), or "in something kindred to slavery," 2 Cong. Rec. 2 (1873) (Sen. Sumner).   See also *United States* v. *Ancarola*, 1 F. 676, 682–683 (CC SDNY 1880) (determining whether such boys were held to involuntary servitude by relying on the defendant's control over the

domination over all aspects of the victim's life, oppressive working and living conditions, and lack of pay or personal freedom are the hallmarks of that slavelike condition of servitude. Focusing on such a slavelike condition not only accords with the type of servitude Congress unambiguously intended to eliminate but also comports well with the policies behind the statute, for the concern that coerced laborers will be unable to relieve themselves from harsh work conditions by changing employers is less likely to be implicated if that laborer has a normal job with time off, personal freedom, and some money, and has contact with other people.[11]

This focus on the actual conditions of servitude also provides an objective benchmark by which to judge either the "intolerability" of alternatives or the victim's capacity for "rational" thought: the alternatives can justifiably be deemed intolerable, or the victim can justifiably be deemed incapable of thinking rationally, if the victim actually felt compelled to live in a slavelike condition of servitude. True, in marginal cases it may well be difficult to determine whether a slavelike condition of servitude existed, but the ambiguity will be a matter of degree on a factual spectrum,[12] not, as in the "no

---

boys and his use of them for his profit and to the injury of their morals). These slavelike conditions can presumably be contrasted with the conditions normally implicated by "'the right of parents and guardians to the custody of their minor children or wards.'" *Ante*, at 944, quoting *Robertson* v. *Baldwin*, 165 U. S. 275, 282 (1897).

[11] "The undoubted aim of the Thirteenth Amendment . . . was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States. . . . [I]n general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of labor." *Pollock* v. *Williams*, 322 U. S. 4, 17–18 (1944).

[12] "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States* v. *Petrillo*, 332 U. S. 1, 7 (1947) (rejecting vagueness challenge to statute making it a crime to coerce the employment of "persons in

tolerable alternative" or "improper or wrongful conduct" tests, a matter of value on which one would expect wide variation among different prosecutors or jurors.  The risk of selective or arbitrary enforcement is thus minimized, and the defendant who, as a result of intentional coercion, employs persons in conditions resembling slavery has fair notice regarding the applicability of the criminal laws.  And many of the more troublesome applications of the Government's open-ended test would be avoided.  For example, § 1584 would not encompass a claim that a regime of religious indoctrination psychologically coerced adherents to work for the church unless it could also be shown that the adherents worked in a slavelike condition of servitude and (given the intent requirement) that the religious indoctrination was not motivated by a desire to spread sincerely held religious beliefs but rather by the intent to coerce adherents to labor in a slavelike condition of servitude.

This restrictive construction of limiting the statute to slavelike conditions, although necessary to comply with the rule of lenity given the inherent ambiguity of the statute

---

excess of the number of employees needed").  Ambiguity over such matters of degree is not obviated by the Court's test, since it requires a determination of whether the degree of physical or legal coercion used was sufficient to compel "involuntary" service.  Cf. *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 590 (1937).  Indeed, the Court introduces a far more profound uncertainty by adopting an understanding of "physical" coercion that encompasses a broad array of what might commonly be understood to be nonphysical forms of coercion.  See n. 5, *supra.*  Although these forms of coercion certainly deserve to be encompassed within § 1584, it is at best obscure under the Court's test what line divides the forms of coercion that are covered by § 1584 from those that are not because the Court never defines its rather unique understanding of "physical" coercion.  Instead, the Court seems to use "physical" as no more than a formal label it applies to those forms of coercion it deems sufficiently egregious to criminalize.  Such a mode of analysis is, of course, conclusory.  Worse, it merely reintroduces all the difficulties of the Government's test in a more obscure and exacerbated form.

where the coercion is neither physical nor legal, is not, however, necessary where the defendant compels involuntary service by the use or threat of legal or physical means. Because the coercive impact of legal or physical coercion is less individualized than other forms of coercion, we need be less concerned about selective or arbitrary enforcement; and the defendant who intentionally employs physical or legal means to coerce labor has fair notice his acts may be criminal. The ambiguity justifying a restrictive reading is, moreover, not present when the means of coercion are those at the heart of the institution of slavery, and it seems clear that Congress would have regarded a victim working under a legal or physical threat as serving in a condition of servitude, however limited in time or scope.[13]

## III

In sum, I conclude that § 1584 reaches cases where the defendant intentionally coerced the victim's labor by the use or threat of legal or physical means or the defendant intentionally coerced the victim into a slavelike condition of servitude by other forms of coercion or by rendering the defendant incapable of rational choice. I therefore concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, concurring in the judgment.

No matter what we write, this case must be remanded for a new trial because the Court of Appeals held that expert testimony was erroneously admitted and the Government has not asked us to review that holding. My colleagues' opinions attempting to formulate an all-encompassing definition of the term "involuntary servitude" demonstrate that this legislative task is not an easy one. They also persuade me that Congress probably intended the definition to be developed in

---

[13] Like the Court, I put aside the exceptional cases it discusses *ante*, at 944.

the common-law tradition of case-by-case adjudication, much as the term "restraint of trade" has been construed in an equally vague criminal statute.

In rejecting an argument that the Sherman Act was unconstitutionally vague, Justice Holmes wrote:

> "But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor. 'The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.' *Commonwealth* v. *Pierce*, 138 Massachusetts, 165, 178 [(1884)]. *Commonwealth* v. *Chance*, 174 Massachusetts, 245, 252 [(1899)]. 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' [1 E. East, Pleas of the Crown 262 (1803)]." *Nash* v. *United States*, 229 U. S. 373, 377 (1913).

A similar approach to the statute before us in this case was expressed by Judge Guy in his dissenting opinion in the Court of Appeals:

> "It is clear that 18 U. S. C. § 1584 is lacking in definitional precision when it makes criminal the holding of one in 'involuntary servitude.' Whether this is the genius of this section or a deficiency to be cured by judicial legislation is not so clear. The majority apparently concludes it is a deficiency and proceeds to cure it by

substituting an arbitrary definition that raises more questions than it answers. In discussing this specific section, Judge Dimock, who concurred in *Shackney*, prophetically wrote:

"'To have an arbitrary classification which will resolve with equal facility all of the cases that would arise under the statute is indeed a tempting prospect. It is much harder to have to work under a statute which will raise difficult questions in the borderline cases inevitable whenever the application of a statute depends upon an appraisal of the state of the human mind. 333 F. 2d at 488.'

. . . . .

"This is not an easy definitional question and it is one on which reasonable minds and federal circuits might differ. I write in dissent, however, primarily because I believe the majority has rewritten rather than interpreted 18 U. S. C. § 1584." 821 F. 2d 1186, 1212–1213 (CA6 1987).

I have a similar reaction to both JUSTICE O'CONNOR's opinion for the Court and to JUSTICE BRENNAN's concurrence. They are both unduly concerned with hypothetical cases that are not before the Court and that, indeed, are far removed from the facts of this case. Although these hypothetical cases present interesting and potentially difficult philosophical puzzles, I doubt that they have any significant relationship to real world decisions that will be faced by possible defendants, prosecutors, or jurors.[1]

---

[1] Although the Government conceded at oral argument that "a parent who coerced an adult son or daughter into working in the family business by threatening withdrawal of affection," might be in violation of the statute, *ante*, at 949, I cannot believe that we need adopt a narrow construction of § 1584 to avoid uncertainty as to such cases. No parent would expect to be prosecuted, no responsible prosecutor would seek indictment, and no reasonable jury would convict for this sort of conduct. Of course, increasingly difficult hypothetical cases can be developed to a point at which rea-

The text of § 1584 identifies three components of this criminal offense.[2]   First, the defendant must have acted "knowingly and willfully."   As the District Court instructed the jury, the Government has the burden of proving that the defendants had "the specific intent" to commit the offense.[3] *Infra*, at 975.   Second, they must have imposed an "involuntary" condition upon their victims.   As the District Court correctly stated, the term "involuntary" means "'done contrary to or without choice'—'compulsory'—'not subject to control of the will.'"   *Infra*, at 971.   Third, the condition that must have been deliberately imposed on the victims against their will must have been a condition of "servitude." As the District Court explained, the term "servitude" means "'[a] condition in which a person lacks liberty especially to de-

sonable persons may disagree.   No legal rule, however, produces certainty and I am convinced that § 1584 is sufficiently definite on its face to apprise the public of what it may and may not do.   The seemingly unambiguous rule adopted by the majority itself admits of grey area.   The Court asserts: "The history of the Padrone statute reflects Congress' view that a victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude."   *Ante*, at 948. Thus, the public is left to ask how young is too young, how vulnerable is too vulnerable, and how much coercion is permissible in light of the victim's age or vulnerability?   The answer to each question, however, like the question presented in this case, is best—if not only—resolved on a case-by-case basis.

   [2] As the Court of Appeals noted, "[t]he trial court instructed the jury to incorporate the definition of involuntary servitude from § 1584 into § 241 which encompasses the Thirteenth Amendment."   821 F. 2d 1186, 1188, n. 3 (CA6 1987).   Because the parties did not challenge this process of incorporation, the Court of Appeals did not reach the question whether § 241 requires a different set of instructions from § 1584 concerning the meaning of "involuntary servitude."   *Ibid.*   Because our decision in this case does not affect the ultimate disposition—that is, a new trial is necessary in any event—I would not extend our analysis beyond the scope of the question considered by the Court of Appeals.

   [3] The full text of the relevant jury instructions appears as an appendix to this opinion.

termine one's course of action or way of life'—'slavery'—'the state of being subject to a master.'"[4]  *Ibid.*  The judge further instructed the jury that the defendants could not be found guilty unless they had used "a means of compulsion . . . sufficient in kind and degree, to subject a person having the same general station in life as the alleged victims to believe they had no reasonable means of escape and no choice except to remain in the service of the employer."  *Infra,* at 972.

I agree with JUSTICE BRENNAN that the reach of the statute extends beyond compulsion that is accompanied by actual or threatened physical means or by the threat of legal action. See *ante,* at 954–959.  The statute applies equally to "physical or mental restraint," cf. *Chatwin* v. *United States,* 326 U. S. 455, 460 (1946), and I would not distinguish between the two kinds of compulsion.  However, unlike JUSTICE BRENNAN, I would not impose the additional requirement in cases involving mental restraint that the victim be coerced into a "slavelike condition of servitude."  To the extent the phrase "slavelike condition of servitude" simply mirrors the term "involuntary servitude," I see no reason for imposing this additional level of definitional complexity.  In my view, individuals attempting to conform their conduct to the rule of law, prosecutors, and jurors are just as capable of understanding and applying the term "involuntary servitude" as they are of applying the concept of "slavelike condition."  Moreover, to the extent "slavelike condition of servitude" means something less than "involuntary servitude," I see no

---

[4] This definition of "servitude" closely resembles the definitions found in the dictionaries that JUSTICE BRENNAN considers in drawing the conclusion that psychological coercion is only covered by the statute if accompanied by a "'slavelike' conditio[n] of servitude."  See *ante,* at 961, and n. 9 ("[I]n 1910 and 1949, Webster's defined 'servitude' as the '[c]ondition of a slave; slavery; serfdom; bondage; state of compulsory subjection to a master. . . . In French and English Colonies of the 17th and 18th centuries, the condition of transported or colonial laborers who, under contract or by custom, rendered service with temporary and limited loss of political and personal liberty'").

basis for reading the statute more narrowly than written. Instead, in determining whether the victims' servitude was "involuntary," I would allow the jury to consider the "totality of the circumstances" just as we do when it is necessary to decide whether a custodial statement is voluntary or involuntary, see, *e. g.*, *Mincey* v. *Arizona*, 437 U. S. 385, 401 (1978). In this case, however, the burden is of course on the Government to prove that the victims did not accept the terms of their existence voluntarily.

In sum, taking the evidence in the light most favorable to the Government, see *Glasser* v. *United States*, 315 U. S. 60, 80 (1942), I am persuaded that the statute gave the defendants fair notice that their conduct was unlawful and that the trial court's instructions, read as a whole, adequately informed the jury as to the elements of the crime. I think they were fairly convicted.

Nevertheless, as I stated at the outset, I must concur in the Court's judgment.

## APPENDIX

### RELEVANT JURY INSTRUCTIONS
(App. to Pet. for Cert. 108a–114a.)

"[Court:] In order to find a particular defendant guilty as charged in Counts II and III of the Indictment, the government must prove beyond a reasonable doubt each of the following elements as to Robert Fulmer for Count II and as to Louis Molitoris for Count III:

"1. That a particular defendant held or aided and abetted in the holding of Robert Fulmer under Count II or Louis Molitoris under Count III to involuntary servitude for a term.

"2. That the act or acts of the defendants were done knowingly or willfully.

"If you find that the government has proved the above two elements as to a particular defendant and as to a particular

count beyond a reasonable doubt, then your verdict will be guilty as to that count and that defendant.

"If, however, you find that the government has failed to prove either or both of the elements set forth above as to a particular defendant and as to a particular count, then your verdict will be not guilty as to that defendant and that count.

"As stated before, the burden is always upon the prosecution to prove beyond a reasonable doubt every element essential to the crime charged; the law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence.

"A person who willfully aids and abets another in the commission of an offense is punishable as a principal.

"In order to aid and abet another to commit a crime it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as in something he wishes to bring about; that is to say, that he willfully seeks by some act or omission to make the criminal venture succeed.

"You, of course, may not find a defendant guilty as to a particular count unless you find beyond a reasonable doubt that every element of the particular offense as defined in these instructions was committed by some person or persons, and that that defendant participated in its commission.

"The government is not required to prove that a defendant personally committed the offense charged. Rather, the government bears the burden of showing (1) that every element of a particular offense as defined in these instructions was committed by some person or persons and (2) that a defendant (a) was that person or one of those persons, or (b) aided and abetted that person or those persons in the commission of the offense.

"Involuntary servitude consists of two terms.

"Involuntary means 'done contrary to or without choice'—'compulsory'—'not subject to control of the will.'

"Servitude means '[a] condition in which a person lacks liberty especially to determine one's course of action or way of life' — 'slavery' — 'the state of being subject to a master.'

"Involuntary servitude involves a condition of having some of the incidents of slavery.

"It may include situations in which persons are forced to return to employment by law.

"It may also include persons who are physically restrained by guards from leaving employment.

"It may also include situations involving either physical and other coercion, or a combination thereof, used to detain persons in employment.

"It may include situations in which the coercive acts or words cause persons in employment to believe they cannot freely leave employment if the acts are done or the words spoken with the intent to cause this result.

"In other words, based on all the evidence it will be for you to determine if there was a means of compulsion used, sufficient in kind and degree, to subject a person having the same general station in life as the alleged victims to believe they had no reasonable means of escape and no choice except to remain in the service of the employer. In this respect you are instructed that you may find that not all persons are of like courage and firmness. You may consider the character and condition of life of the parties, the relative inferiority or inequality between the persons who perform the service and the persons exercising the force or influence to compel its performance and the defendants' knowledge of these matters.

"The matter involves the knowledge and intent of the person charged as well as the character and understanding of the alleged victim.

"It is not part of the Government's burden of proof, in order for you to return a verdict of guilty, to show that an alleged victim named in the Indictment made an attempt to escape. You may, however, consider any evidence of escape attempts as well as the opportunities to leave and the volun-

tary remaining or returning as bearing upon the voluntariness of the person's labor.

"In determining whether the service was involuntary, you are instructed that it makes no difference whether or not the persons alleged to have been held in involuntary servitude initially agreed voluntarily to work. If a person desires to withdraw, and then is forced to remain and perform services against his will, his service is involuntary.

"In the same sense, the failure to pay a person who voluntarily performs labor does not transform that labor into an 'involuntary servitude.'

"Of course, an employer can use any legitimate means to retain the services of an employee, such as offering the employee benefits, or seeking to convince the employee that he would be better off if he continued in his employment.

"Payment of wages to the alleged victims or the conferring of other benefits on them is of course a proper means of attempting to retain their services. You should take evidence of such payment or benefits into account in your determination of whether or not the improper conduct of a particular defendant, if you find such improper conduct to have occurred, was a necessary cause of the decision of one or both of the alleged victims to remain on the farm. However, the fact that the alleged victims were paid or were given other benefits does not necessarily mean that they were not held in involuntary servitude.

"As I have instructed you, you must consider all of the factors that might have influenced the decision of both of the alleged victims to remain on the farm. The desire to receive wages and benefits may have been one such factor. However, you must still determine whether or not the improper conduct of a defendant, if any, was a necessary cause of the decision of one or both of the alleged victims to remain.

"In order to find that a particular defendant is guilty of holding one or both of the alleged victims in involuntary servitude, in addition to the necessary coercion and intention on

the part of the defendants, you must find that those means were an actual and necessary cause of the decision of one or both of the alleged victims to continue working for the Kozminskis. In other words, you must determine if one or both of the alleged victims would have left the employment if they had not been subjected to improper conduct on the part of that particular defendant.

"In determining whether or not the improper means was a necessary cause of the decision of the alleged victim to continue working for the Kozminskis, you must evaluate all of the factors that might have affected that decision, including any legitimate means used by that defendant to convince the alleged victim to retain the employment. After considering all of the factors that might have affected that decision, you must decide whether or not the decision of either or both of the alleged victims to remain on the farm would have been made if improper means had not been used by a particular defendant.

"If you determine that either or both of the alleged victims would have continued to work for the Kozminskis regardless of the use of improper means by that particular defendant then you must find that the improper conduct of that defendant was not a necessary cause of the decision of both victims to retain their employment.

"In making the determination involving involuntary servitude, you may consider all of the evidence in this case to determine if a particular defendant held or aided and abetted in the holding of either Louis Molitoris or Robert Arthur Fulmer to involuntary servitude.

"I caution you again as I have before, however, the defendants are not on trial for failure to comply with minimum wage laws, or for violating certain social regulations or for assault or battery or for using bad language in a coercive way. Neither are they on trial for neglect, for misappropriation of money, or for breach of an employment contract. Your at-

tention must be directed to the discrete charge outlined in these instructions.

"You will note that Element One requires proof that the victim was held 'for a term,' that is, a period of time. In that respect, I instruct you that it is not necessary for the Government to prove any given specific term of an appreciable length of time. If the person was held for any term, regardless of how short such term may be, it would come within the 'held for a term' provisions of the statute.

"Element Two requires that the acts of the defendants were done knowingly and willfully.

"An act, omission, or failure to act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

"The word 'knowingly' is used to insure that no one will be convicted for an act done because of mistake, or accident, or other innocent reason.

"An act, omission, or failure to act is done 'willfully' if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

"You will note that to act knowingly requires that the act be done intentionally. The crimes charged requires proof of specific intent before a defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids, or knowingly failed to do an act which the law requires, purposely intending to violate the law.

"Such intent may be determined from all the facts and circumstances surrounding the case. Specific intent must be proved beyond a reasonable doubt before there can be a conviction.

"Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of

the human mind. But, you may infer the defendant's intent from the surrounding circumstances.

"You may consider any statement made by the defendant, and all other facts and circumstances in evidence which indicate the state of mind. You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

"As I have said, it is entirely up to you to decide what facts to find from the evidence.

"You will note that the Indictment charges that the offense was committed 'on or about' a certain date. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes, beyond a reasonable doubt, that the offense was committed on a date reasonably near the date alleged.

"That is the end of the instructions relating to Counts II and III of the Indictment."