[873 NYS2d 72]

In the Matter of Felix Vinluan et al., Petitioners, v Robert W. Doyle, Justice of the Supreme Court, Suffolk County, et al., Respondents.

Second Department, January 13, 2009

238

APPEARANCES OF COUNSEL

*Sandback, Birnbaum & Michelen*, Mineola (*Oscar Michelen* of counsel), for Felix Vinluan, petitioner.

*Kase & Druker*, Garden City (*James O. Druker* and *Paula Frome* of counsel), for Elmer Jacinto and others, petitioners.

*Thomas J. Spota, District Attorney*, Riverhead (*Leonard Lato* of counsel), respondent pro se.

*Spivak Lipton, LLP*, New York City (*Elizabeth Orfan* and *Adrienne L. Saldana* of counsel), for American Nurses Association and another, amici curiae.

*Giskin, Solotaroff, Anderson & Steward, LLP*, New York City (*Darnley D. Stewart* of counsel), for National Employment Lawyers Association/New York, amicus curiae, and *Steven Banks*, New York City (*Adriene L. Holder, Christopher D. Lamb, Amy M. Hong* and *Richard Blum* of counsel), for The Legal Aid Society, amicus curiae (one brief filed).

*Levy Ratner, P.C.*, New York City (*David M. Slutsky* of counsel), for 1199 SEIU United Healthcare Workers East, amicus curiae.

## OPINION OF THE COURT

ENG, J.

Ten nurses, all from the Republic of the Philippines, are under indictment in Suffolk County for the misdemeanor offenses of conspiracy in the sixth degree, endangering the welfare of a child, and endangering the welfare of a physically-disabled person. The prosecution of these individuals came in the aftermath of their simultaneous resignations from positions at a Long Island nursing home. The attorney who provided these nurses with legal advice was also indicted.

The Thirteenth Amendment to the United States Constitution, enacted at the conclusion of the Civil War primarily to abolish the institution of slavery, declares that involuntary servitude shall not be permitted to exist within the United States. In this proceeding, we are asked to determine whether

the constitutional prohibition against involuntary servitude would be violated by prosecuting these nurses, and whether the prosecution of their attorney would violate constitutionally-protected First Amendment rights. For the reasons which follow, we find that these criminal prosecutions constitute an impermissible infringement upon the constitutional rights of these nurses and their attorney, and that the issuance of a writ of prohibition to halt these prosecutions is the appropriate remedy in this matter.

The petitioners Elmer Jacinto, Juliet Anilao, Harriet Avila, Mark Dela Cruz, Claudine Gamiao, Jennifer Lampa, Rizza Maulion, James Millena, Ma Theresa Ramos, and Ranier Sichon (hereinafter the nurses) were recruited to work in the United States by the Sentosa Recruitment Agency, a Philippines-based company that hires nurses for several nursing care facilities in New York controlled and managed by Sentosa Care, LLC (hereinafter Sentosa). According to the nurses, the recruitment agency promised that they would be hired directly by individual nursing homes within the Sentosa network. To this end, each of the nurses signed an employment contract with the specific nursing homes for which they had been selected to work. Under the terms of these employment contracts, the nurses were to receive free travel to the United States, two months of free housing and medical coverage, training, and assistance in obtaining legal residency and nursing licenses. In recognition of the substantial expenses incurred in the recruitment process, the contracts required the nurses to give their prospective employers a three-year commitment, and provided for liquidated damages in the amount of $25,000 should the nurses fail to honor their commitment.

When the nurses arrived in the United States, they learned that they would be working for an employment agency instead of the specific nursing homes they had signed contracts with, which allegedly is a lower paid and less stable form of employment. The nurses were assigned by the employment agency to the Avalon Gardens Rehabilitation and Health Care Center (hereinafter Avalon Gardens), a nursing home located in Smithtown, New York. Among the patients at Avalon Gardens are chronically ill children who need the assistance of ventilators to breathe. All of the nurses were trained to care for children on ventilators, and five of the nurses worked almost exclusively with these children.

The nurses alleged that almost immediately upon their arrival at Avalon Gardens, issues arose concerning the terms of

their employment, and the promises made to them in the Philippines were breached. When the nurses first arrived at the facility to begin their employment, they discovered that Avalon Gardens had not obtained their limited nursing licenses, and thus many of them were initially required to work as clerks for about $12 per hour. Furthermore, the nurses allegedly were housed in a single-family staff house with only one bathroom, inadequate heat, and no telephone service. After informal oral complaints about their working conditions and pay went unheeded, in February and March of 2006 the nurses wrote several letters to Sentosa and Avalon Gardens outlining their concerns, including the failure to compensate them properly for overtime and night shifts, short staffing, and last minute shift changes.

Believing that their complaints were not being properly addressed, the nurses sought assistance from the Philippine Consulate, and were referred to the petitioner Felix Vinluan, an attorney specializing in immigration law. When Vinluan met with the nurses to discuss their options, they told him that they wanted to resign because they could not tolerate the working conditions they were experiencing much longer. Vinluan advised the nurses that under the Education Law, they could not leave their positions during a shift when they were on duty. Although Vinluan also counseled the nurses that they had the right to resign once their shifts had ended, he suggested that it might be in their best interest to remain at Avalon Gardens while he pursued other remedies on their behalf. Following his meeting with the nurses, on April 6, 2006, Vinluan traveled to Washington, D.C., where he filed a complaint on their behalf with the Office of Special Counsel for Immigration Related Unfair Employment Practices.

On the following day, April 7, 2006, the nurses resigned from their employment either at the end of their shift or in advance of their next shift, using an identical form letter which they had agreed upon together. The amount of notice provided before the next scheduled shift for each nurse ranged from 8 to 72 hours. Vinluan claims that he was unaware of the nurses' intention to resign on April 7. The nurses maintain that they decided to collectively resign with limited notice because they feared retaliation during any notice period they might have given. Fourteen other Filipino nurses employed by three other Sentosa nursing homes also resigned from their employment between April 6 and April 7.

In the wake of the resignations, Sentosa commenced a civil action against Vinluan and the nurses in the Nassau County Supreme Court seeking damages, inter alia, for breach of contract and tortious interference with contract. In addition, on April 10, 2006, Avalon Gardens' Director of Nursing sent the New York State Education Department (hereinafter the Education Department) a letter of complaint charging that the nurses had abandoned their patients by simultaneously resigning without adequate notice. Following an investigation, on September 28, 2006, the Education Department closed the nurses' cases, concluding that they had not committed professional misconduct because none of them had resigned in mid-shift, and no patients were deprived of nursing care since the facility was able to obtain appropriate coverage.

However, in March 2007, nearly one year after the resignations, a Suffolk County grand jury handed down a 13-count indictment against the petitioners. The first count of the indictment charged Vinluan and the nurses with conspiracy in the sixth degree predicated upon their alleged intent to engage in conduct constituting the crimes of endangering the welfare of a child and endangering the welfare of a physically-disabled person. The first count theorized that the object of the conspiracy was to obtain alternative employment for the nurses and a release from their three-year commitment to Sentosa without incurring a financial penalty of $25,000. Furthermore, the indictment alleged that Vinluan and the nurses pursued their objective "without regard to the consequences that their pursuit would have on Avalon Gardens' pediatric patients," and that the nurses resigned without notice despite "knowing that their resignations and the prior resignations at other Sentosa Care facilities would render it difficult for Avalon Gardens to find, in a timely manner, skilled replacement nurses for Avalon Gardens' pediatric patients." The overt acts alleged to have been committed in furtherance of the conspiracy consisted of Vinluan's filing of a federal discrimination claim on behalf of the nurses, and the nurses' submission of their resignation letters. The second count of the indictment charged Vinluan alone with criminal solicitation in the fifth degree, asserting that he, with the intent that the nurses engage in conduct constituting the crimes of endangering the welfare of a child and endangering the welfare of a physically-disabled person, "requested and otherwise attempted to cause the nurses to resign immediately from Avalon Gardens."

Counts three through seven of the indictment charged that all of the petitioners had acted in concert to endanger the welfare of five of Avalon Gardens' pediatric patients by knowingly acting in a manner likely to be injurious to the physical and mental welfare of the children. The six remaining counts further charged that the petitioners had acted in concert to endanger the welfare of six physically-disabled patients by knowingly acting in a manner likely to be injurious to their physical welfare.

Vinluan and the nurses separately moved to dismiss the criminal indictment in the Supreme Court, Suffolk County. In support of their motion, the nurses argued, among other things, that the prosecution violated their Thirteenth Amendment rights. The Supreme Court denied the motions to dismiss, concluding that there was ample evidence before the grand jury to support all of the counts against the petitioners. Addressing the nurses' constitutional argument, the court found that the prosecution did not violate their Thirteenth Amendment rights because it could not be said that the People were attempting to compel their continued employment by any particular entity. Vinluan and the nurses commenced this proceeding pursuant to CPLR article 78 to prohibit the respondent Thomas J. Spota, District Attorney, from prosecuting them, and to prohibit the respondent Robert W. Doyle, Justice of the Supreme Court, Suffolk County, from presiding over the matter, upon the grounds, inter alia, that the prosecution violates the nurses' Thirteenth Amendment rights and Vinluan's First Amendment rights. Justice Doyle has elected not to appear in this proceeding pursuant to CPLR 7804 (i).

When a petitioner seeks relief in the nature of prohibition, the court must engage in a "two-tiered analysis" which requires it to determine, as a threshold question, "whether the issue presented is the type for which the remedy may be granted" (*Matter of Holtzman v Goldman*, 71 NY2d 564, 568 [1988]). Thus, we begin by examining whether a proceeding for a writ of prohibition is an appropriate vehicle in which to raise this challenge to the constitutionality of a pending criminal proceeding. Historically issued by the Crown of England to curb the powers of ecclesiastical courts, writs of prohibition have evolved into "a basic means of protection for the individual in his [or her] relations with the State" (*Matter of Rush v Mordue*, 68 NY2d 348, 352 n 2 [1986]; *see Matter of Dondi v Jones*, 40 NY2d 8 [1976]; *La Rocca v Lane*, 37 NY2d 575, 578-579 [1975], *cert denied* 424

US 968 [1976]). As codified by CPLR 7803 (2), prohibition lies to prevent a body or officer acting in a judicial or quasi-judicial capacity from proceeding, or threatening to proceed, "without or in excess of jurisdiction" (*Matter of Town of Huntington v New York State Div. of Human Rights*, 82 NY2d 783, 786 [1993]; *see Matter of Schumer v Holtzman*, 60 NY2d 46, 51 [1983]).

The primary function of prohibition is to prevent "an arrogation of power in violation of a person's rights, particularly constitutional rights" (*Matter of Nicholson v State Commn. on Jud. Conduct*, 50 NY2d 597, 606 [1980]). Although "not all constitutional claims are cognizable by way of prohibition" (*Matter of Rush v Mordue*, 68 NY2d 348, 354 [1986]), the presentation of an "arguable and substantial claim" which implicates a fundamental constitutional right generally results in the availability of a proceeding in the nature of prohibition (*Matter of Nicholson v State Commn. on Jud. Conduct*, 50 NY2d 597, 606 [1980]). Thus, for example, a CPLR article 78 proceeding in the nature of prohibition has been permitted to interrupt pending criminal proceedings where a defendant is about to be prosecuted in violation of his constitutional right against double jeopardy (*see Matter of Rush v Mordue*, 68 NY2d 348, 354 [1986]; *Matter of Kraemer v County Ct. of Suffolk County*, 6 NY2d 363 [1959]) or in violation of his Fifth Amendment privilege against self-incrimination (*see Matter of Rush v Mordue*, 68 NY2d at 355; *Matter of Lee v County Ct. of Erie County*, 27 NY2d 432 [1971], *cert denied* 404 US 823 [1971]). In such circumstances, the Court of Appeals has concluded that a CPLR article 78 proceeding in the nature of prohibition may properly be utilized to prevent the defendants from being prosecuted for crimes for which they could not be constitutionally tried. The Court of Appeals also has found prohibition to be a proper vehicle to vindicate claimed infringements on the First Amendment rights of freedom of religion and freedom of association (*see Matter of Nicholson v State Commn. on Jud. Conduct*, 50 NY2d 597 [1980]; *La Rocca v Lane*, 37 NY2d 575 [1975]).

In the case before us, the petitioners raise claims of equally compelling constitutional dimension. They invoke the remedy of prohibition on the theory that the prosecution itself is not a proper proceeding because it contravenes the Thirteenth Amendment proscription against involuntary servitude by seeking to impose criminal sanctions upon the nurses for resigning their positions, and attempts to punish Vinluan for exercising his First Amendment right of free speech in providing the

nurses with legal advice. If the prosecution impermissibly infringes upon these constitutional rights, the act of prosecuting the petitioners would be an act in excess of power, rather than a mere error of law, and prohibition would be an available remedy (*see Matter of Rush v Mordue*, 68 NY2d 348, 352 [1986]; *Matter of Nicholson v State Commn. on Jud. Conduct*, 50 NY2d 597, 606-607 [1980]; *Matter of Cohen v Lotto*, 19 AD3d 485, 486 [2005]).

Where, as here, the issue presented allows for the issuance of a writ of prohibition, the court must proceed to the second tier of the analysis, which requires it to determine whether the remedy of prohibition is "warranted by the merits of the claim" (*Matter of Holtzman v Goldman*, 71 NY2d 564, 568 [1988]; *see Matter of Town of Huntington v New York State Div. of Human Rights*, 82 NY2d 783, 786 [1993]). We note that "even if prohibition lies and an act in excess of power is perceived, the remedy is not granted as of right but only in the sound discretion of the reviewing court" (*Matter of Holtzman v Goldman*, 71 NY2d 564, 569 [1988]). Thus, if there is merit to the petitioners' claim that the subject prosecution violates their constitutional rights, as a final step in our inquiry we must decide whether a writ of prohibition should issue as a matter of discretion by weighing relevant factors, including the gravity of the potential harm caused by the threatened excess of power, whether the potential harm can be adequately corrected on appeal or by other proceedings in law or equity, and "whether prohibition would furnish 'a more complete and efficacious remedy . . . even though other methods of redress are technically available' " (*Matter of Rush v Mordue*, 68 NY2d 348, 354 [1986], quoting *Matter of Dondi v Jones*, 40 NY2d 8, 14 [1976]).

Turning to the merits, the nurses contend that subjecting them to criminal sanctions for their act of resigning effectively compels them to remain at their jobs and, therefore, subjects them to involuntary servitude in violation of the Thirteenth Amendment. The Thirteenth Amendment, added to the Constitution in 1865, declares that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States" (§ 1). It has been observed that "[b]y forbidding not only slavery but also factual situations that resemble slavery, the Framers expressed a view of personal liberty that extends beyond freedom from legal ownership by another person" (Lauren Kares, *The Unlucky Thirteenth: A Constitutional Amend-*

*ment in Search of a Doctrine*, 80 Cornell L Rev 372, 374 [1995]). "While the general spirit of the phrase 'involuntary servitude' is easily comprehended, the exact range of conditions it prohibits is harder to define" (*United States v Kozminski*, 487 US 931, 942 [1988]). Nevertheless, Supreme Court precedent makes clear that absent "exceptional circumstances," the Thirteenth Amendment bars compulsory labor "enforced by the use or threatened use of physical or legal coercion" (*United States v Kozminski*, 487 US at 944).

Compelling the performance of labor through legal coercion was at issue in three cases decided by the United States Supreme Court in the first half of the last century, *Pollock v Williams* (322 US 4 [1944]), *Taylor v Georgia* (315 US 25 [1942]) and *Bailey v Alabama* (219 US 219 [1911]). In all three cases, the Supreme Court struck down state laws which criminalized the failure to perform a contract for labor or services for which an advance had been received. The challenged statutes all made a worker's mere failure to perform services for which money had been obtained prima facie evidence of an intent to defraud. In the first of the three cases addressing this issue, *Bailey v Alabama*, the Supreme Court explained that while the ostensible purpose of the statute under review was to punish fraud, "its natural and inevitable effect is to expose to conviction for a crime those who simply fail or refuse to perform contracts for personal service in liquidation of a debt." Continuing its analysis, the *Bailey* Court stated that

> "[w]hat the state may not do directly it may not do indirectly. If it cannot punish the servant as a criminal for the mere failure or refusal to serve without paying his debt, it is not permitted to accomplish the same result by creating a statutory presumption which, upon proof of no other fact, exposes him to conviction and punishment. Without imputing any actual motive to oppress, we must consider the natural operation of the statute here in question . . . and it is apparent that it furnishes a convenient instrument for the coercion" forbidden by the Thirteenth Amendment (219 US at 244).

Confronted with a similar statutory provision in *Taylor v Georgia*, the Supreme Court concluded that the challenged statute squarely contravened the Thirteenth Amendment because the necessary consequence of the law "is that one who has received an advance on a contract for services which he is un-

able to repay is bound by the threat of penal sanction to remain at his employment until the debt has been discharged" (315 US at 29).

More than 30 years after its decision in *Bailey*, the Supreme Court in *Pollock v Williams* was again obligated to address the constitutionality of a law making it a crime to obtain property by fraudulently promising to perform labor or services when Florida enacted a statute essentially identical to those that it had previously struck down. In adhering to the conclusion that imposing criminal penalties for the mere failure to perform labor or services was unconstitutional, the Supreme Court emphasized in *Pollock* that the aim of the Thirteenth Amendment was not merely to end slavery, "but to maintain a system of completely free and voluntary labor throughout the United States" (322 US at 18). In this regard, the Court pointed out that as a general rule, the right to change employers was a worker's defense "against oppressive hours, pay, working conditions, or treatment," and that depriving workers of this right would result in "depression of working conditions and living standards" (*id.* at 18). Although the *Pollock* Court recognized that there was great societal value in the enforcement of contracts and collection of debt, it concluded that the constitutional prohibition against compulsory service "means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor. The . . . statutory test is a practical inquiry into the utilization of an act as well as its mere form and terms" (*id.* at 18).

The New York Court of Appeals subsequently relied upon the Supreme Court's decisions in *Bailey*, *Taylor* and *Pollock* to conclude that a New York City Administrative Code provision which made it a misdemeanor to abandon or willfully fail to perform a home improvement contract was unconstitutional (*see People v Lavender*, 48 NY2d 334 [1979]). The *Lavender* Court found that the Administrative Code provision at issue violated the Thirteenth Amendment because it was directed at the failure to perform the services necessary to carry out the home improvement contract. Thus, the Court reversed the defendant's conviction of three counts of an indictment which charged him with having abandoned three home improvement contracts without justification.

In the case at bar, the Penal Law provisions relating to endangerment of children and the physically disabled, which all

the petitioners are charged with violating, do not on their face infringe upon Thirteenth Amendment rights by making the failure to perform labor or services an element of a crime. The Supreme Court's rationale in *Pollock, Taylor* and *Bailey* is nevertheless instructive because the indictment handed down against the petitioners explicitly makes the nurses' conduct in resigning their positions a component of each of the crimes charged. Thus, the indictment places the nurses in the position of being required to remain in Sentosa's service after submitting their resignations, even if only for a relatively brief period of notice, or being subject to criminal sanction. Accordingly, the prosecution has the practical effect of exposing the nurses to criminal penalty for exercising their right to leave their employment at will. The imposition of such a limitation upon the nurses' ability to freely exercise their right to resign from the service of an employer who allegedly failed to fulfill the promises and commitments made to them is the antithesis of the free and voluntary system of labor envisioned by the framers of the Thirteenth Amendment. While we are, of course, mindful that protecting vulnerable children from harm is of enormous importance, the fact that the prosecution may serve a legitimate societal aim does not suspend the nurses' constitutional right to be free from involuntary service (*see Pollock v Williams*, 322 US 4 [1944]).

We are also cognizant of the fact that Thirteenth Amendment rights are not absolute, and that "not all situations in which labor is compelled by . . . force of law" are unconstitutional (*United States v Kozminski*, 487 US 931, 943 [1988]; *see United States v Ballek*, 170 F3d 871, 874 [1999], *cert denied* 528 US 853 [1999]; *Immediato v Rye Neck School Dist.*, 73 F3d 454, 459 [1996], *cert denied* 519 US 813 [1996]; *Jobson v Henne*, 355 F2d 129, 131 [1966]). It has been recognized that the Thirteenth Amendment "was not intended to apply to 'exceptional' cases well established in the common law at the time" of its enactment (*United States v Kozminski*, 487 US at 944, quoting *Robertson v Baldwin*, 165 US 275, 282 [1897]). Thus, the amendment has been held inapplicable to a narrow class of civic duties that have traditionally been enforced by means of imprisonment, including military service (*see United States v Kozminski*, 487 US at 944; *Selective Law Draft Cases*, 245 US 366, 390 [1918]; *United States v Balleck*, 170 F3d 871, 874 [1999]). Addressing this issue in *Bailey*, the Supreme Court explained that an individual's right to be free from involuntary service may be limited in

"exceptional cases, such as the service of a sailor . . . or the obligations of a child to its parents, or of an apprentice to his master, or the power of the legislature to make unlawful and punish criminally an abandonment by an employee of his post of labor in any extreme cases" (*Bailey v Alabama*, 219 US at 243).

Guided by these principles, we conclude that this is not an exceptional case justifying a restriction of the petitioners' Thirteenth Amendment rights. The nurses in this case were engaged in private employment rather than the performance of public service. Moreover, while they possessed the education and training necessary to care for chronically ill patients, including children on ventilators, these skills are not so unique or specialized that they cannot be readily performed by other qualified nurses. Furthermore, although an employee's abandonment of his or her post in an "extreme case" may constitute an exceptional circumstance which warrants infringement upon the right to freely leave employment, the respondent District Attorney proffers no reason why this is an "extreme case." The nurses did not abandon their posts in the middle of their shifts. Rather, they resigned after the completion of their shifts, when the pediatric patients at Avalon Gardens were under the care of other nurses and staff members. Moreover, while the indictment alleges that the nurses collectively resigned "knowing that their resignations and the prior resignations at other Sentosa Care facilities would render it difficult for Avalon Gardens to find, in a timely manner, skilled replacement nurses for Avalon Gardens' pediatric patients," it is undisputed that coverage was indeed obtained, and no facts suggesting an imminent threat to the well-being of the children have been alleged. Indeed, the fact that no children were deprived of nursing care played a large role in the Education Department's decision to clear the nurses of professional misconduct. Under these circumstances, we cannot conclude that this is such an "extreme case" that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer.

Indeed, the relevant Penal Law sections underlying these prosecutions proscribe the creation of risk to children and the

physically disabled. Under the facts as presented herein, the greatest risk created by the resignation of these nurses was to the financial health of Sentosa.

 Furthermore, the prosecution impermissibly violates Vinluan's constitutionally protected rights of expression and association in violation of the First and Fourteenth Amendments. It cannot be doubted that an attorney has a constitutional right to provide legal advice to his clients within the bounds of the law (*see In re Primus*, 436 US 412, 432 [1978]; *Transportation Union v State Bar of Mich.*, 401 US 576, 580 [1971]; *Trainmen v Virginia ex rel. Virginia State Bar*, 377 US 1, 7-8 [1964]; *NAACP v Button*, 371 US 415, 429 [1963]; *see also Walters v National Assn. of Radiation Survivors*, 473 US 305, 368 n 16 [1985, Stevens, J., dissenting]). "The First and Fourteenth Amendments require a measure of protection for 'advocating lawful means of vindicating legal rights' . . . including 'advis-[ing] another that his legal rights have been infringed' " (*In re Primus*, 436 US at 432, quoting *NAACP v Button*, 371 US at 437, 434). Thus, in *Button*, the Supreme Court found constitutionally protected, as modes of expression and association, the actions of NAACP staff lawyers in, inter alia, advising African Americans "of their constitutional rights [and] urging them to institute litigation of a particular kind" (*NAACP v Button*, 371 US at 447 [White, J., concurring in part and dissenting in part]; *see also In re Primus*, 436 US at 425 n 16). Similarly, the Supreme Court concluded in *Primus* that an attorney's letter communicating an offer of free legal assistance by ACLU attorneys to a woman with whom she had previously discussed the possibility of seeking redress for an allegedly unconstitutional sterilization procedure was a form of protected expression.

As charged in the indictment, it is clear that Vinluan's criminal liability is predicated upon the exercise of ordinarily protected First Amendment rights. The indictment asserts that Vinluan committed the charged offenses by counseling the nurses to immediately resign from Avalon Gardens, and filing a discrimination claim on their behalf. Thus, the indictment affirmatively seeks to punish Vinluan for providing legal advice, which he avers was given in good faith. The District Attorney does not dispute that Vinluan acted in good faith, but urges this court to conclude that his legal advice to the nurses was not constitutionally protected because he advised them to commit a crime. However, since the nurses' conduct in resigning cannot,

under the circumstances of this case, subject them to criminal prosecution, we cannot agree that Vinluan advised the nurses to commit a crime.

More importantly, regardless of whether Vinluan's legal assessment was accurate, it was objectively reasonable. We cannot conclude that an attorney who advises a client to take an action that he or she, in good faith, believes to be legal loses the protection of the First Amendment if his or her advice is later determined to be incorrect. Indeed, it would eviscerate the right to give and receive legal counsel with respect to potential criminal liability if an attorney could be charged with conspiracy and solicitation whenever a District Attorney disagreed with that advice. The potential impact of allowing an attorney to be prosecuted in circumstances such as those presented here is profoundly disturbing. A looming threat of criminal sanctions would deter attorneys from acquainting individuals with matters as vital as the breadth of their legal rights and the limits of those rights. Correspondingly, where counsel is restrained, so is the fundamental right of the citizenry, bound as it is by laws complex and unfamiliar, to receive the advice necessary for measured conduct. Moreover, by placing an attorney in the position of being required to defend the advice that he or she has provided, the State compels revelation of, and thus places within its reach, confidential communications between attorney and client. Such communications have long been held to be privileged in order to enable citizens to safely and readily secure "the aid of persons having knowledge of the law and skill[ ] in its practice" (*Hunt v Blackburn*, 128 US 464, 470 [1888]). A prosecution which would compel the disclosure of privileged attorney-client confidences and potentially inflict punishment for the good faith provision of legal advice is, in our view, more than a First Amendment violation. It is an assault on the adversarial system of justice upon which our society, governed by the rule of law rather than individuals, depends.

Finally, the last step in our inquiry requires us to determine whether a writ of prohibition should issue as a matter of discretion. Upon weighing the relevant factors (*see Matter of Rush v Mordue*, 68 NY2d 348, 354 [1986]), we conclude that prohibition is an appropriate exercise of discretion. Where, as here, the petitioners are threatened with prosecution for crimes for which they cannot constitutionally be tried, the potential harm to them is "so great and the ordinary appellate process so inadequate to redress that harm" that prohibition should lie (*Matter of Rush v Mordue*, 68 NY2d at 354).

Accordingly, the petition is granted, the respondent Thomas J. Spota, District Attorney, is prohibited from prosecuting the petitioners in the Supreme Court, Suffolk County, under indictment No. 00769-07, and the respondent Robert W. Doyle is prohibited from presiding over the matter.

In light of our determination, we need not reach the petitioners' remaining contentions.

SANTUCCI, J.P., ANGIOLILLO and CHAMBERS, JJ., concur.

Adjudged that the petition is granted, without costs or disbursements, the respondent Thomas J. Spota, District Attorney, is prohibited from prosecuting the petitioners in the Supreme Court, Suffolk County, under indictment No. 00769-07, and the respondent Robert W. Doyle is prohibited from presiding over the matter.