# CONSTITUTIONALITY OF THE MATTHEW SHEPARD HATE CRIMES PREVENTION ACT

*The two new criminal prohibitions created in the Matthew Shepard Hate Crimes Prevention Act would be constitutional.*

June 16, 2009

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL OFFICE OF LEGISLATIVE AFFAIRS

You have asked for our views on the constitutionality of a pending bill, S. 909, the Matthew Shepard Hate Crimes Prevention Act. In particular, you have asked us to review section 7(a) of S. 909, which would amend title 18 of the United States Code to create a new section 249, which would establish two criminal prohibitions called "hate crime acts."

First, proposed section 249(a)(1) would prohibit willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, "because of the actual or perceived race, color, religion, or national origin of any person." This provision is similar to an existing federal law, 18 U.S.C. § 245 (2006), the principal difference being that the new section 249(a)(1), unlike section 245, would not require the prosecutor to prove that the victim was or had been "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."

Second, proposed section 249(a)(2) would prohibit willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, "because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity or disability of any person," section 249(a)(2)(A), but only if the conduct occurs in at least one of a series of defined "circumstances" that have a specified connection with or effect upon interstate or foreign commerce, *see* section 249(a)(2)(B). This new provision would prohibit certain forms of discriminatory violence—namely, violence committed because of a person's actual or perceived gender, sexual orientation, gender identity or disability—that are not addressed by the existing section 245 of title 18.[1]

S. 909 is, in these respects, nearly identical to a bill this Office reviewed in 2000.[2] In our analysis of that proposed legislation, which your Office transmitted to Congress, we concluded that the bill would be constitutional. *See* Letter for Senator Edward Kennedy from Robert Raben, Assistant Attorney General, Office of Legislative Affairs, United States Department of

---

[1] A new proposed section 249(a)(3) would make the same conduct unlawful if done within the special maritime or territorial jurisdiction of the United States—a provision that does not raise any serious questions with respect to Congress's authority. *See United States v. Sharpnack*, 355 U.S. 286, 288 (1958).

[2] The principal material difference is that section 249(a)(2) of S. 909 encompasses violence on the basis of a person's real or perceived gender identity, something that the 2000 legislation did not address.

Justice (June 13, 2000) (attached); *see also* S. Rep. No. 107-147, at 15-23 (2002) ("Senate Report") (reprinting the OLA Letter containing the 2000 OLC analysis as an explanation of the constitutional basis for such legislation). In 2007, however, the Office of Management and Budget indicated to the 110th Congress that one provision of such legislation would raise constitutional concerns, *see* Statement of Administration Policy on H.R. 1592 (May 3, 2007), as did the Attorney General, *see* Letter for the Hon. Carl Levin, Chairman, Senate Committee on Armed Services, from Michael B. Mukasey, Attorney General, at 6 (Nov. 13, 2007) (regarding section 1023 of H.R.1585).

We have carefully reviewed the relevant legal materials and now conclude, as we did in 2000, that the legislation is constitutional. The Attorney General concurs in this view.

Section 249(a)(1)

As we explained in 2000, *see* Senate Report at 16-18, we believe Congress has authority under section 2 of the Thirteenth Amendment to punish racially motivated violence as part of a reasonable legislative effort to extinguish the relics, badges and incidents of slavery. Congress may rationally determine, as it would do in S. 909, that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude," and that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race." S. 909 § 2(7); *see also* H.R. 1585, 110th Cong., § 1023(b)(7) (2007) (same).[3]

Like the current 18 U.S.C. § 245, proposed section 249(a)(1) of title 18 would not be limited by its terms to violence involving racial discrimination: It would criminalize violence committed "because of the actual or perceived race, color, *religion, or national origin* of any person." S. 909 explains (§ 2(8)) that "in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments."

As we have previously concluded, under existing case law the proscription of violence motivated by "religion" and "national origin" would constitute a valid exercise of Congress's Thirteenth Amendment authority insofar as "the violence is directed at members of those religions or national origins that would have been considered races at the time of the adoption of the Thirteenth Amendment." Senate Report at 17-18; *see also Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 610-613 (1987) (holding that the prohibition of race discrimination in 42 U.S.C. § 1981, a Reconstruction-era statute that was enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, extends to discrimination against Arabs, as Congress intended to protect "identifiable classes of persons who are subjected to intentional discrimination solely

---

[3] Given our conclusion that Congress possesses authority to enact this provision under the Thirteenth Amendment, we do not address whether Congress might also possess sufficient authority under the Commerce Clause and/or the Fourteenth Amendment. *See United States v. Nelson*, 277 F.3d 164, 174-75 & n.10 (2d Cir. 2002).

because of their ancestry or ethnic characteristics"); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (holding that Jews can state a claim under 42 U.S.C. § 1982, another antidiscrimination statute enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, because Jews "were among the peoples [at the time the statutes were adopted] considered to be distinct races"); *Hodges v. United States*, 203 U.S. 1, 17 (1906) ("Slavery or involuntary servitude of the Chinese, of the Italian, of the Anglo-Saxon, are as much within its compass as slavery or involuntary servitude of the African."); *United States v. Nelson*, 277 F.3d 164, 176-78 (2d Cir. 2002) (concluding that 18 U.S.C. § 245 could be applied constitutionally to protect Jews against crimes based on their religion, because Jews were considered a "race" when the Thirteenth Amendment was adopted). While it is true that the institution of slavery in the United States, the abolition of which was the primary impetus for the Thirteenth Amendment, primarily involved the subjugation of African Americans, it is well-established by Supreme Court precedent that Congress's authority to abolish the badges and incidents of slavery extends "to legislat[ion] in regard to 'every race and individual.'" *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 n.18 (1976) (*quoting Hodges*, 203 U.S. at 16-17).[4]

Although "there is strong precedent to support the conclusion that the Thirteenth Amendment extends its protections to religions directly, and thus to members of the Jewish religion, without the detour through historically changing conceptions of 'race,'" *id.* at 179, it remains an open question whether and to what extent the Thirteenth Amendment empowers Congress to address forms of discrimination short of slavery and involuntary servitude with respect to religions and national origins that were *not* considered "races" in 1865. Accordingly, to the extent violence is directed at victims on the basis of a religion or national origin that was not regarded as a "race" at the time the Thirteenth Amendment was ratified, prosecutors may choose to bring actions under the Commerce Clause provision of S. 909, i.e., proposed 18 U.S.C. § 249(a)(2), if they can prove the elements of such an offense. *See* Senate Report at 15.

Proposed section 249(a)(1) differs from the current 18 U.S.C. § 245 in that it would not require the government to prove that the defendant committed the violence because the victim was or had been "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."[5] The outer limits of the

---

[4] In *McDonald*, for example, the Supreme Court held that 42 U.S.C. § 1981, a Reconstruction-era statute that was enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, prohibits racial discrimination in the making and enforcement of contracts against all persons, including whites. *See* 427 U.S. at 286-96.

[5] Section 245(b)(2) makes it a crime, "whether or not acting under color of law, by force or threat of force willfully [to] injure[], intimidate[] or interfere[] with, or attempt[] to injure, intimidate or interfere with . . . any person because of his race, color, religion or national origin and because he is or has been—

(A) enrolling in or attending any public school or public college;

(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;

(C) applying for or enjoying employment, or any perquisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency;

expansive list of specified activities in section 245 have not been conclusively defined, but courts have concluded that the section protects, *inter alia*, drinking beer in a public park (*see United States v. Allen*, 341 F.3d 870 (9th Cir. 2003)), and walking on a city street (*see Nelson*). Although it is not clear that Congress included the activities element of section 245 in order to justify an exercise of its Thirteenth Amendment enforcement powers,[6] the courts have held that section 245 is proper Thirteenth Amendment legislation. *See, e.g., Nelson; Allen.*

The Supreme Court's decisions in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *Griffin v. Breckenridge*, 403 U.S. 88 (1971), support the further judgment that the Thirteenth Amendment does not require such a federal-activities element. In *Jones*, the Court upheld section 1 of the Civil Rights Act of 1866 (now 42 U.S.C. § 1982) as a valid exercise of Congress's Thirteenth Amendment enforcement authority. The statute in *Jones* was limited to discriminatory interferences with the rights to make contracts and buy or sell property, but the Court did not rest its approval on that limitation. Instead, the Court wrote, "[s]urely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." 392 U.S. at 440. Similarly, in *Griffin*, the Court held that the Thirteenth Amendment supported application of the Ku Klux Klan Act (now 42 U.S.C. § 1985) to a case of racially motivated violence intended to deprive the victims of what the Court called "the basic rights that the law secures to all free men," 403 U.S. at 105—which in that case, according to the complaint, included the "right to be secure in their person" and "their rights to travel the public highways without restraint," *id.* at 91-92. The Court again endorsed the broad *Jones* formulation, which contains no interference-with-protected-activities limitation: "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* at 105. To be sure, "there exist indubitable connections . . . between post Civil War efforts to return freed slaves to a subjugated status and private violence directed at interfering with and discouraging the freed slaves' exercise of civil rights in public places." *Nelson*, 277 F.3d at 190. But there are also such "indubitable connections" "between slavery and private violence directed

---

(D) serving, or attending upon any court of any State in connection with possible service, as a grand or petit juror;

(E) traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air;

(F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and

> (i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and

> (ii) which holds itself out as serving patrons of such establishments."

[6] *See Nelson*, 277 F.3d at 191 n.26 (explaining that Congress included the "participating in or enjoying civil rights" requirement in section 245 for purposes of providing a basis for the provision under the Fourteenth Amendment and possibly also the Fifteenth Amendment).

against despised and enslaved groups" more generally. *Id.*[7] In light of these precedents, and consistent with our conclusion in 2000, *see* Senate Report at 16-17, we think it would be rational at the very least for Congress to find that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race" and that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude," S. 909 § 2(7), regardless of whether the perpetrator in a particular case is attempting to deprive the victim of the use of the activities covered by the current section 245.

We therefore conclude, as we did in 2000, that the prohibition of discriminatory violence in section 249(a)(1) would be a permissible exercise of Congress's broad authority to enforce the Thirteenth Amendment.

### Section 249(a)(2)

Proposed section 249(a)(2) of S. 909 would be a proper exercise of Congress's authority under the Commerce Clause, U.S. Const. art. 1, § 8, cl. 3, because it would require the Government to allege and prove beyond a reasonable doubt in each case that there is an explicit and discrete connection between the proscribed conduct and interstate or foreign commerce. In particular, it would require that the offense have occurred "in any circumstance described in [proposed 18 U.S.C. § 249(a)(2)(B)]." Those enumerated circumstances are that:

(i) the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim—(I) across a State line or national border; or (II) using a channel, facility, or instrumentality of foreign commerce;

(ii) the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);

(iii) in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or

(iv) the conduct described in subparagraph (A)—(I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or (II) otherwise affects interstate commerce.

---

[7] As the Second Circuit noted in *Nelson*, the Supreme Court has limited the scope of Congress's enforcement authority under section 5 of the Fourteenth Amendment in a series of recent cases. *See* 277 F.3d at 185 n.20. But as that court also noted, these precedents do not address the Thirteenth Amendment, which contemplates an inquiry that the Supreme Court has referred to as the "inherently legislative task of defining involuntary servitude." *Id.* (quoting *United States v. Kozminski*, 487 U.S. 931, 951 (1988)). The court of appeals in *Nelson* further explained that "the task of defining 'badges and incidents' of servitude is by necessity even more inherently legislative." *Id.* Finally, we note that the Thirteenth Amendment, unlike the Fourteenth Amendment, contains no state-action requirement, a distinction of relevance in determining Congress's authority to regulate private, racially motivated violence. *See* Senate Report at 18.

As we explained in 2000, *see* Senate Report at 18-23, requiring proof of at least one of these "jurisdictional" elements would "ensure, through case-by-case-inquiry, that the [offense] in question affects interstate commerce." *United States v. Lopez*, 514 U.S. 549, 561 (1995). Nothing in the law since 2000 calls this analysis into question.[8]

For these reasons we adhere to our 2000 conclusion that the new criminal offenses created in S. 909 would be wholly constitutional.

/s/

MARTIN S. LEDERMAN
Deputy Assistant Attorney General

---

[8] *See, e.g., United States v. Dorsey*, 418 F.3d 1038, 1045-46 (9th Cir. 2005) (upholding 18 U.S.C. § 922(q)(2)(A), which makes it a crime "knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place the individual knows, or has reasonable cause to believe, is a school zone"); *United States v. Capozzi*, 347 F.3d 327, 335-36 (1st Cir. 2003) (upholding the Hobbs Act, 18 U.S.C. § 1951(a), which makes it a federal crime to commit or attempt to commit extortion that "in any way or degree, obstructs, delays or affects [interstate] commerce").



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General        *Washington, D.C. 20530*

June 13, 2000

The Honorable Edward Kennedy
United States Senate
Washington, D.C. 20510

Dear Senator Kennedy:

This letter responds to your request for our views on the constitutionality of a proposed legislative amendment entitled the "Local Law Enforcement Enhancement Act of 2000." Section 7(a) of the bill would amend title 18 of the United States Code to create a new § 249, which would establish two criminal prohibitions called "hate crime acts." First, proposed § 249(a)(1) would prohibit willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, or an explosive or incendiary device, "because of the actual or perceived race, color, religion, or national origin of any person." Second, proposed § 249(a)(2) would prohibit willfully causing bodily injury to any person, or attempting to cause bodily injury to any person through the use of fire, a firearm, or an explosive or incendiary device, "because of the actual or perceived religion, national origin, gender, sexual orientation, or disability of any person," § 249(a)(2)(A), but only if the conduct occurs in at least one of a series of defined "circumstances" that have an explicit connection with or effect on interstate or foreign commerce, § 249(a)(2)(B).

In light of United States v. Morrison, 120 S. Ct. 1740 (2000), and other recent Supreme Court decisions, defendants might challenge the constitutionality of their convictions under § 249 on the ground that Congress lacks power to enact the proposed statute. We believe, for the reasons set forth below, that the statute would be constitutional under governing Supreme Court precedents.[1] We consider in turn the two proposed new crimes that would be created in § 249.

---

[1] Because you have asked specifically about the effect of Morrison on the constitutionality of the proposed bill, this letter addresses constitutional questions relating only to Congress's power to enact the proposed bill.

## 1.     Proposed 18 U.S.C. § 249(a)(1)

Congress may prohibit the first category of hate crime acts that would be proscribed — actual or attempted violence directed at persons "because of the[ir] actual or perceived race, color, religion, or national origin," § 249(a)(1) — pursuant to its power to enforce the Thirteenth Amendment to the United States Constitution.[2] Section 1 of that amendment provides, in relevant part, "[n]either slavery nor involuntary servitude . . . shall exist within the United States." Section 2 provides, "Congress shall have power to enforce this article by appropriate legislation."

Under the Thirteenth Amendment, Congress has the authority not only to prevent the "actual imposition of slavery or involuntary servitude," but to ensure that none of the "badges and incidents" of slavery or involuntary servitude exists in the United States. Griffin v. Breckinridge, 403 U.S. 88, 105 (1971); see Jones v. Alfred H. Mayer Co., 392 U.S. 409, 440-43 (1968) (discussing Congress's power to eliminate the "badges," "incidents," and "relic[s]" of slavery). "'Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation.'" Griffin, 403 U.S. at 105 (quoting Jones, 392 U.S. at 440); see also Civil Rights Cases, 109 U.S. 3, 21 (1883) ("Congress has a right to enact all necessary and proper laws for the obliteration and prevention of slavery, with all its badges and incidents"). In so legislating, Congress may impose liability not only for state action, but for "varieties of private conduct," as well. Griffin, 403 U.S. at 105.

Section 2(10) of the bill's findings provides, in relevant part, that "eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude," and that "[s]lavery and involuntary servitude were enforced . . . through widespread public and private violence directed at persons because of their race." So long as Congress may rationally reach such determinations — and we believe Congress plainly could[3] — the prohibition of racially motivated violence would be a permissible exercise of Congress's broad authority to enforce the Thirteenth Amendment.

That the bill would prohibit violence against not only African Americans but also persons of other races does not alter our conclusion. While it is true that the institution of slavery in the United States, the abolition of which was the primary impetus for the Thirteenth Amendment, primarily involved the subjugation of African Americans, it is well-established by Supreme Court precedent that Congress's authority to abolish the badges and incidents of slavery extends "to legislat[ion] in regard to 'every race and individual.'" McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 288 n.18 (1976) (quoting Hodges v. United States, 203 U.S. 1, 16-17 (1906),

---

[2] Given our conclusion that Congress possesses authority to enact this provision under the Thirteenth Amendment, we do not address whether Congress might also possess authority under the Commerce Clause and the Fourteenth Amendment.

[3] See, e.g., Patterson v. McLean Credit Union, 491 U.S. 164, 183 (1989); Jones, 392 U.S. at 441 n.78; Hodges v. United States, 203 U.S. 1, 34-35 (1906) (Harlan, J., dissenting).

and citing Jones v. Alfred H. Mayer Co., 392 U.S. 409, 441 n.78 (1968)). In McDonald, for example, the Supreme Court held that 42 U.S.C. § 1981, a Reconstruction-era statute that was enacted pursuant to, and contemporaneously with, the Thirteenth Amendment, prohibits racial discrimination in the making and enforcement of contracts against all persons, including whites. See McDonald, 427 U.S. at 286-96.

The question whether Congress may prohibit violence against persons because of their actual or perceived religion or national origin is more complex, but there is a substantial basis to conclude that the Thirteenth Amendment grants Congress that authority, at a minimum, with respect to some religions and national origins. In Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987), the Court held that the prohibition of discrimination in § 1981 extends to discrimination against Arabs, as Congress intended to protect "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Similarly, the Court in Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 617-18 (1987), held that Jews can state a claim under 42 U.S.C. § 1982, another Reconstruction-era antidiscrimination statute enacted pursuant to, and contemporaneously with, the Thirteenth Amendment. In construing the reach of these two Reconstruction-era statutes, the Supreme Court found that Congress intended those statutes to extend to groups like "Arabs" and "Jews" because those groups "were among the peoples [at the time the statutes were adopted] considered to be distinct races." Id.; see also Saint Francis College, 481 U.S. at 610-13. We thus believe that Congress would have authority under the Thirteenth Amendment to extend the prohibitions of proposed § 249(a)(1) to violence that is based on a victim's religion or national origin, at least to the extent the violence is directed at members of those religions or national origins that would have been considered races at the time of the adoption of the Thirteenth Amendment.[4]

None of the Court's recent federalism decisions casts doubt on Congress's powers under the Thirteenth Amendment to eliminate the badges and incidents of slavery. Both Boerne v. Flores, 521 U.S. 507 (1997), and United States v. Morrison, 120 S. Ct. 1740 (2000), involved legislation that was found to exceed Congress's powers under the Fourteenth Amendment. The Court in Morrison, for example, found that Congress lacked the power to enact the civil remedy of the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981, pursuant to the Fourteenth Amendment because that amendment's equal protection guarantee extends only to "state action," and the private remedy there was not, in the Court's view, sufficiently directed at such "state action." 120 S. Ct. at 1756, 1758. The Thirteenth Amendment, however, plainly reaches private conduct as well as government conduct, and Congress thus is authorized to prohibit private action that constitutes a badge, incident or relic of slavery. See Griffin, 403 U.S. at 105; Jones, 392 U.S. at 440-43. Enactment of the proposed § 249(a)(1) therefore would be within Congress's Thirteenth Amendment power.

---

[4] In light of the Court's construction of §§ 1981 and 1982 in Shaare Tefila Congregation and St. Francis College, it would be consistent for the Court so to construe this legislation, especially with sufficient guidance from Congress.

## 2. Proposed 18 U.S.C. § 249(a)(2)

Congress may prohibit the second category of hate crime acts that would be proscribed — certain instances of actual or attempted violence directed at persons "because of the[ir] actual or perceived religion, national origin, gender, sexual orientation, or disability," § 249(a)(1)(A) — pursuant to its power under the Commerce Clause of the Constitution, art. I., § 8, cl. 3.

The Court in Morrison emphasized that "even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds." 120 S. Ct. at 1748; see also United States v. Lopez, 514 U.S. 549, 557-61 (1995). Consistent with the Court's emphasis, the prohibitions of proposed § 249(a)(2) (in contrast to the provisions of proposed § 249(a)(1), discussed above), would not apply except where there is an explicit and discrete connection between the proscribed conduct and interstate or foreign commerce, a connection that the government would be required to allege and prove in each case.

In Lopez, the Court considered Congress's power to enact a statute prohibiting the possession of firearms within 1000 feet of a school. Conviction for a violation of that statute required no proof of a jurisdictional nexus between the gun, or the gun possession, and interstate commerce. The statute included no findings from which the Court could find that the possession of guns near schools substantially affected interstate commerce and, in the Court's view, the possession of a gun was not an economic activity itself. Under these circumstances, the Court held that the statute exceeded Congress's power to regulate interstate commerce because the prohibited conduct could not be said to "substantially affect" interstate commerce. Proposed § 249(a)(2), by contrast to the statute invalidated in Lopez, would require pleading and proof of a specific jurisdictional nexus to interstate commerce for each and every offense.

In Morrison, the Court applied its holding in Lopez to find unconstitutional the civil remedy provided in VAWA, 42 U.S.C. § 13981. Like the prohibition of gun possession in the statute at issue in Lopez, the VAWA civil remedy required no pleading or proof of a connection between the specific conduct prohibited by the statute and interstate commerce. Although the VAWA statute was supported by extensive congressional findings of the relationship between violence against women and the national economy, the Court was troubled that accepting this as a basis for legislation under the Commerce Clause would permit Congress to regulate anything, thus obliterating the "distinction between what is truly national and what is truly local." Morrison, 120 S. Ct. at 1754 (citing Lopez, 514 U.S. at 568). By contrast, the requirement in proposed § 249(a)(2) of proof in each case of a specific nexus between interstate commerce and the proscribed conduct would ensure that only conduct that falls within the Commerce power, and thus is "truly national," would be within the reach of that statutory provision.

The Court in Morrison emphasized, as it did in Lopez, 514 U.S. at 561-62, that the statute the Court was invalidating did not include an "express jurisdictional element," 120 S. Ct. at 1751, and compared this unfavorably to the criminal provision of VAWA, 18 U.S.C. § 2261(a)(1), which does include such a jurisdictional nexus. See id. at 1752 n.5. The Court indicated that the presence of such a jurisdictional nexus would go far towards meeting its constitutional concerns:

> The second consideration that we found important in analyzing [the statute in Lopez] was that the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." [514 U.S.] at 562. Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce.

Id. at 1750-51; see also id. at 1751-52 ("Although Lopez makes clear that such a jurisdictional element would lend support to the argument that [the provision at issue in Morrison] is sufficiently tied to interstate commerce, Congress elected to cast [the provision's] remedy over a wider, and more purely intrastate, body of violent crime.").

While the Court in Morrison stated that Congress may not "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce," id. at 1754, the proposed regulation of violent conduct in § 249(a)(2) would not be based "solely on that conduct's aggregate effect on interstate commerce," but would instead be based on a specific and discrete connection between each instance of prohibited conduct and interstate or foreign commerce. Specifically, with respect to violence because of the actual or perceived religion, national origin, gender, sexual orientation or disability of the victim, proposed § 249(a)(2) would require the government to prove one or more specific jurisdictional commerce "elements" beyond a reasonable doubt. This additional jurisdictional requirement would reflect Congress's intent that § 249(a)(2) reach only a "'discrete set of [violent acts] that additionally have an explicit connection with or effect on interstate commerce," 120 S. Ct. at 1751 (quoting Lopez, 514 U.S. at 562), and would fundamentally distinguish this statute from those that the Court invalidated in Lopez and in Morrison.[5] Absent such a jurisdictional element, there exists the risk that "a few random instances of interstate effects could be used to justify regulation of a multitude of intrastate transactions with no interstate effects." United States v. Harrington, 108 F.3d 1460, 1467 (D.C. Cir. 1997). By contrast, in the context of a statute with an interstate jurisdictional element (such as in proposed § 249(a)(2)(B)), "each case stands alone on its evidence that a concrete and specific effect does exist." Id.[6]

---

[5] See also Morrison, 120 S. Ct. at 1775 (Breyer, J., dissenting) ("the Court reaffirms, as it should, Congress' well-established and frequently exercised power to enact laws that satisfy a commerce-related jurisdictional prerequisite — for example, that some item relevant to the federally regulated activity has at some time crossed a state line"). Of course, our reliance on the jurisdictional nexus in § 249(a)(2) is not intended to suggest that such a jurisdictional nexus is always necessary to sustain Commerce Clause legislation.

[6] That a jurisdictional element makes a material difference for constitutional purposes is demonstrated by the Lopez Court's citation to the jurisdictional element in the statute at issue in United States v. Bass, 404 U.S. 336 (1971), as an example of a provision that "would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." 514 U.S. at 561. The Lopez Court wrote:

> For example, in United States v. Bass, 404 U.S. 336 (1971), the Court interpreted former 18 U.S.C. § 1202(a), which made it a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce ... any firearm." 404 U.S., at 337. The Court interpreted the possession component of § 1202(a) to require an additional nexus to interstate commerce both because the

The jurisdictional elements in § 249(a)(2)(B) would ensure that each conviction under § 249(a)(2) would involve conduct that Congress has the power to regulate under the Commerce Clause. In Morrison, the Court reiterated its observation in Lopez that there are "'three broad categories of activity that Congress may regulate under its commerce power.'" 120 S. Ct. at 1749 (quoting Lopez, 514 U.S. at 558):

> "First, Congress may regulate the use of the channels of interstate commerce. . . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. . . . Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, . . . i.e., those activities that substantially affect interstate commerce."

Id. (quoting Lopez, 514 U.S. at 558-59).

Proposed § 249(a)(2)(B)(i) would prohibit the violent conduct described in § 249(a)(2)(A) where the government proves that the conduct "occurs in the course of, or as the result of, the travel of the defendant or the victim (a) across state lines or national borders, or (b) using a channel, facility, or instrumentality of interstate or foreign commerce." A conviction based on such proof would be within Congress's powers to "regulate the use of the channels of interstate commerce," and to "regulate and protect . . . persons or things in interstate commerce." Proposed § 249(a)(2)(B)(ii) would prohibit the violent conduct described in § 249(a)(2)(A) where the government proves that the defendant "uses a channel, facility or instrumentality of interstate or foreign commerce in connection with the conduct" — such as by sending a bomb to the victim via common carrier — and would fall within the power of Congress to "regulate the use of the channels of interstate commerce" and "to regulate and protect the instrumentalities of interstate commerce."[7]

---

statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." Id., at 349.

514 U.S. at 561-62. In Bass itself, the Government argued that the statute in question should be construed not to require proof that the gun possession was in, or affected, interstate commerce. The Court responded that the Government's proposed "broad construction" would "render[] traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources." 404 U.S. at 350. The Court accordingly construed the statute to require "proof of some interstate commerce nexus in each case," so that the statute would not "dramatically intrude[] upon traditional state criminal jurisdiction," id., in the way it would if there were no requirement of proof in each case of the nexus to interstate commerce.

[7] Such prohibitions are not uncommon in the federal criminal code. See, e.g., 18 U.S.C. § 231(a)(2) (1994) (prohibiting the transport in commerce of any firearm, explosive or incendiary device, knowing or having reason to know, or intending, that it will be used unlawfully in furtherance of a civil disorder); 18 U.S.C. § 875 (1994) (prohibiting the transmission in interstate or foreign commerce of certain categories of threats and ransom demands); 18 U.S.C. § 1201(a)(1) (Supp. IV 1998) (prohibiting the willful transportation in interstate or foreign commerce of a kidnaping victim); 18 U.S.C. § 1462 (1994 & Supp. II 1996) (prohibiting the transmission of

Proposed § 249(a)(2)(B)(iii) would prohibit the violent conduct described in § 249(a)(2)(A) where the government proves that the defendant "employs a firearm, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce in connection with the conduct."[8] Such a provision addresses harms that are, in a constitutionally important sense, facilitated by the unencumbered movement of weapons across state and national borders, and is similar to several other federal statutes in which Congress has prohibited persons from using or possessing weapons and other articles that have at one time or another traveled in interstate or foreign commerce.[9] The courts of appeals uniformly have upheld the constitutionality of such statutes.[10] And, in Lopez itself, the Supreme Court cited to the jurisdictional element in the statute at issue in United States v. Bass, 404 U.S. 336 (1971), as an example of a provision that "would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." 514 U.S. at 561. In Bass, 404 U.S. at 350-

---

obscene materials via common carrier); 18 U.S.C. § 1952 (1994) (prohibiting travel in interstate or foreign commerce, or the use of "any facility in interstate or foreign commerce," with the intent to commit or facilitate certain unlawful activities).

[8] We understand that this subsection would sanction the conduct described in subparagraph (A) where, in connection with that conduct, the defendant employs a firearm, an explosive or incendiary device, or another weapon, that has traveled in interstate or foreign commerce.

[9] For example:

● It is unlawful for convicted felons to receive any firearm or ammunition (18 U.S.C. § 922(g) (1994 & Supp. 1999), or to receive or possess any explosive (18 U.S.C. § 842(i) (1994)), "which has been shipped or transported in interstate or foreign commerce."

● A statute enacted as a response to Lopez makes it unlawful (with certain exceptions) for any individual knowingly to possess or discharge a firearm "that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows . . . is a school zone." 18 U.S.C. § 922(q)(2)-(3) (1994 & Supp. 1999).

● It is unlawful, with the intent to cause death or serious bodily harm, to engage in certain so-called "carjackings" of motor vehicles that "ha[ve] been transported, shipped, or received in interstate or foreign commerce." 18 U.S.C.A. § 2119 (West 2000).

● It is unlawful knowingly to possess matters containing any visual depiction that "involves the use of a minor engaging in sexually explicit conduct" that "has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer." 18 U.S.C.A. § 2252(a)(4)(B) (West Supp. 2000).

[10] See, e.g., United States v. Folen, 84 F.3d 1103, 1104 (8th Cir. 1996) (§ 842(i)); Fraternal Order of Police v. United States, 173 F.3d 898, 907-08 & n.2 (D.C. Cir.), and cases cited therein (§ 922(g)), cert. denied, 120 S. Ct. 324 (1999); Gillespie v. City of Indianapolis, 185 F.3d 693, 704-06 (7th Cir. 1999), and cases cited therein (same), cert. denied, 120 S. Ct. 934 (2000); United States v. Bostic, 168 F.3d 718, 723-24 (4th Cir.), cert. denied, 527 U.S. 1029 (1999) (same); United States v. Danks, 187 F.3d 643 (8th Cir. 1999) (per curiam) (table), 1999 WL 615445 at *1-*2 (§ 922(q)), cert. denied, 120 S. Ct. 823 (2000); United States v. Cobb, 144 F.3d 319, 320-22 (4th Cir. 1998), and cases cited therein (§ 2119); United States v. Bausch, 140 F.3d 739, 741 (8th Cir. 1998) (§ 2252(a)(4)(B)), cert. denied, 525 U.S. 1072 (1999); United States v. Robinson, 137 F.3d 652, 655-56 (1st Cir. 1998) (same).

51, and in Scarborough v. United States, 431 U.S. 563 (1977), the Court construed that statutory element to permit conviction upon proof that a felon had received or possessed a firearm that had at some time passed in interstate commerce.

Proposed § 249(a)(2)(B)(iv)(I) would apply only where the government proves that the violent conduct "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct." This is one specific manner in which the violent conduct can affect interstate or foreign commerce.[11] This jurisdictional element also is an exercise of Congress's power to regulate "'persons or things in interstate commerce.'" Morrison, 120 S. Ct. at 1749 (quoting Lopez, 514 U.S. at 558). As Justice Kennedy (joined by Justice O'Connor) wrote in Lopez, 514 U.S. at 574, "Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy."[12]

Finally, proposed § 249(a)(2)(B)(iv)(II) would prohibit the violent conduct described in § 249(a)(2)(A) where the government proves that the conduct "otherwise affects interstate or foreign commerce." Such "affects commerce" language has long been regarded as the appropriate means for Congress to invoke the full extent of its authority. See, e.g., Jones v. United States, 120 S. Ct. 1904 (2000), No. 99-5739, slip op. at 5 (May 22, 2000) ("the statutory term 'affecting . . . commerce,' . . . when unqualified, signal[s] Congress' intent to invoke its full authority under the Commerce Clause"); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273 (1995) ("Th[e] phrase — 'affecting commerce' — normally signals Congress's intent to exercise its Commerce Clause powers to the full.").[13] Of course, that this element goes to the

---

[11]  See, e.g., United States v. Nguyen, 155 F.3d 1219, 1224-25 (10th Cir. 1998), cert. denied, 525 U.S. 1167 (1999); see also, e.g., United States v. Thomas, 159 F.3d 296, 297-98 (7th Cir. 1998), cert. denied, 527 U.S. 1023 (1999).

[12]  In this regard, it is worth noting that at least eight Justices in Morrison and in Lopez indicated that Congress can take a broad view as to what constitutes "commercial" or "economic" activity. See Morrison, 120 S. Ct. at 1750 (listing, as examples of "congressional Acts regulating intrastate economic activity," the statutes at issue in Wickard v. Filburn, 317 U.S. 111 (1942) (restricting the intrastate growing of wheat on a farm for personal home consumption); and Perez v. United States, 402 U.S. 146 (1971) (prohibiting intrastate loansharking)); id. at 1750 n.4 (describing the statute in Wickard as "regulat[ing] activity . . . of an apparent commercial character"); id. at 1765 (Souter, J., dissenting); see also Lopez, 514 U.S. at 560-61; id. at 573 (Kennedy, J., dissenting); id. at 628-30 (Breyer, J., dissenting).

[13]  Such a jurisdictional element is found in many federal statutes, including criminal provisions that prohibit violent conduct or conduct that facilitates violence. See, e.g.:

•  18 U.S.C. § 231(a)(1) (1994) (prohibiting the teaching or demonstration of the use or making of firearms, explosives, or incendiary devices, or of techniques capable of causing injury or death, knowing or having reason to know or intending that the teaching or demonstration will be unlawfully employed in, or in furtherance of, a civil disorder "which may in any way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in commerce");

•  18 U.S.C.A. § 247(a)-(b) (West 2000) (prohibiting the intentional defacement, damaging or destruction of religious real property because of the religious character of that property, and the intentional obstruction

extent of Congress's constitutional power does not mean that it is unlimited. Interpretation of the "affecting . . . commerce" provision would be addressed on a case-by-case basis, within the limits established by the Court's doctrine. There likely will be cases where there is some question whether a particular type or quantum of proof is adequate to show the "explicit" and "concrete" effect on interstate and foreign commerce that the element requires. See Harrington, 108 F.3d at 1464, 1467 (citing Lopez, 514 U.S. at 562, 567). But on its face this element is, by its nature, within Congress's Commerce Clause power.[14]

---

by force or threat of force of any person in the enjoyment of that person's free exercise of religious beliefs, where "the offense is in or affects interstate or foreign commerce");

- 18 U.S.C.A. § 2332a(a)(2) (West Supp. 2000) (prohibiting the use, without lawful authority, of a weapon of mass destruction, including any biological agent, toxin, or vector, where the results of such use "affect interstate or foreign commerce").

[14] See United States v. Green, 350 U.S. 415, 420-21 (1956) (upholding constitutionality of Hobbs Act, 18 U.S.C. § 1951(a) (1994) — which prohibits robbery or extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" — because "racketeering affecting interstate commerce [is] within federal legislative control"); see also United States v. Valenzeno, 123 F.3d 365, 367-68 (6th Cir. 1997) (affirming that Lopez did not affect constitutionality of Hobbs Act); United States v. Robinson, 119 F.3d 1205, 1212-14 (5th Cir. 1997) (same), cert. denied, 522 U.S. 1139 (1998).

In sum, because § 249(a)(2) would prohibit violent conduct in a "discrete set" of cases, 120 S. Ct. at 1751 (quoting Lopez, 514 U.S. at 562), where that conduct has an "explicit connection with or effect on" interstate or foreign commerce, id., it would satisfy the constitutional standards articulated in the Court's recent decisions.[15]

The Office of Management and Budget has advised that there is no objection from the standpoint of the Administration's program to the presentation of this letter.

Sincerely,

Robert Raben
Assistant Attorney General

---

[15] Any argument that Morrison sub silentio implies that Congress lacks any power whatever under the Commerce Clause to regulate violent crime (or that Congress may do so only where each violation by itself "substantially affects" interstate or foreign commerce), is unwarranted. For reasons explained above, the presence of a jurisdictional element materially distinguishes a statute such as proposed § 249(a)(2) from the statutes at issue in Lopez and in Morrison. The Court in Morrison explained that such an element helps to ensure that the statute will reach only "'a discrete set'" of offenses, and will not extend to conduct that lacks an "'explicit connection with or effect on interstate commerce.'" 120 S. Ct. at 1751 (quoting Lopez, 514 U.S. at 562). What is more, the findings in sections 2(6)-(9) of the draft bill would, if adopted by Congress, reflect Congress's conclusion that the bill's proposed § 249(a)(2) is appropriate legislation under each of the three Commerce Clause "categories" identified in Lopez and in Morrison. Section 2(6) would find that the violence in question "substantially affects interstate commerce in many ways, including – (A) by impeding the movement of members of targeted groups and forcing such members to move across State lines to escape the incidence or risk of such violence; and (B) by preventing members of targeted groups from purchasing goods and services, obtaining or sustaining employment or participating in other commercial activity." Sections 2(7)-(9) would find that perpetrators "cross State lines to commit such violence," use the channels, facilities and instrumentalities of interstate commerce to commit such violence, and use articles that have traveled in interstate commerce to commit such crimes. While such findings might not in and of themselves be "sufficient" to justify Congress's assertion of its Commerce Clause authority, see Morrison, 120 S. Ct. at 1752, nevertheless they would provide important support for Congress's authority under the Commerce Clause to enact the draft hate-crimes bill's proposed § 249(a)(2), see 120 S. Ct. at 1751 (citing Lopez, 514 U.S. at 563).